## ARROW-HART & HEGEMAN ELECTRIC CO. *v.* FEDERAL TRADE COMMISSION.

No. 363. Argued February 8, 1934.—Decided March 12, 1934.

588

*Mr. Charles Neave,* with whom *Messrs. Arthur F. Mullen, Arthur L. Shipman, Charles Welles Gross,* and *Wallace W. Brown* were on the brief, for petitioner.

*Solicitor General Biggs,* with whom *Assistant Attorney General Stephens* and *Messrs. Moses S. Huberman, Robert E. Healy,* and *Everett F. Haycraft* were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The Circuit Court of Appeals [1] affirmed an order of the Federal Trade Commission issued pursuant to § 7 of the Clayton Act. [2] A writ of certiorari was granted upon the claim of petitioner that the formation of a holding company which acquired all the voting shares of two manufacturing corporations was not in violation of the section, or, if it was, the merger of the two manufacturing corporations and dissolution of the holding company after complaint by the Federal Trade Commission deprived the latter of jurisdiction to make any order against the company formed by the merger. A proper understanding of these contentions requires a somewhat detailed statement of events prior and subsequent to the issuance of the complaint.

The Arrow Electric Company, hereafter called Arrow, and the Hart & Hegeman Manufacturing Company, hereafter called Hart & Hegeman, were Connecticut corporations engaged in the manufacture and sale in interstate commerce of electric wiring devices. Both were solvent and successful. There was no community of ownership of the stock of the two concerns. Each had valuable trade names by which its goods were known to consumers.

---

[1] 65 F. (2d) 336.

[2] Act of October 15, 1914, c. 323, § 7, 38 Stat. 731; U.S.C. Title 15, § 18. The relevant paragraph is as follows:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

Shortly after the death of the principal stockholder, who was also the president, of Hart & Hegeman, the major interests in that company got into touch with those controlling Arrow, and after some negotiation it was agreed that economies could be effected if the business of both were brought under common control. In view, however, of the competition between the goods known by the names of the two manufacturing companies, it was thought that the trade names and the identity of the goods could best be preserved by retaining the separate corporate entities and the sales forces of the two organizations. The plan evolved was, therefore, that of a holding company which should own all of the common shares of both corporations, under the control of which the manufacturing and sales organizations should be kept separate and distinct and in competition with each other as theretofore. In order to bring about an equitable division of the stock of the proposed holding corporation, Arrow issued to its common stockholders a dividend in preferred stock. The recipients sold the preferred shares to a syndicate, which in turn sold them to the public. Hart & Hegeman increased its common stock and issued the new stock as a stock dividend. It also created an issue of preferred stock, which was sold to the public. Prior to the acquisition of the common stock by the holding company the capitalization was as follows:

Arrow—Common stock, $750,000, par $25. Preferred stock, $2,000,000, par $100.

Hart & Hegeman—Common stock, $500,000, par $25, Preferred stock, $1,333,300 par $100.

The holders of preferred stock in each company were without the right to vote for directors except upon default in the payment of six successive dividends, in which case the preferred stockholders were entitled to elect the board. In October, 1927, Arrow-Hart & Hegeman, Incorporated, hereafter called the holding company, was

organized under the laws of Connecticut. It had only common stock. The owners of all of the common shares of Arrow exchanged them for 120,000 shares of the stock of the holding company and the owners of all the common shares of Hart & Hegeman exchanged them for 80,000 shares of the same stock.

On March 3, 1928, the Federal Trade Commission issued a complaint in which it charged the effect of the holding and voting of all of the common shares of the two operating companies might be to substantially lessen competition between the companies in electrical wiring devices, to restrain commerce in those devices, and to create a monopoly. The holding company filed an answer traversing these allegations. Shortly thereafter counsel advised that the company be dissolved and its assets, consisting of the stock of Arrow and of Hart & Hegeman, be distributed amongst its stockholders, and that thereupon the two latter companies merge into a single corporation under the laws of Connecticut, thus transferring to the new corporation to be formed by merger all of the assets of Arrow and of Hart & Hegeman.

It was discovered that such a program might cast heavy taxes upon the stockholders, and a modification was suggested to work out the plan in accordance with the reorganization sections of the Revenue Act of 1928. The stockholders of the holding company and the preferred stockholders of both the operating companies were notified of the original plan and of its modification, and proxies were asked so that their votes might be recorded at corporate meetings intended to be held to carry out the proposal. A two-thirds vote of both preferred and common stock is required by the law of Connecticut to authorize a merger.

In lieu of the original program of distribution of the shares owned by the holding company to its stockholders, the shares of Arrow were transferred to a new company.

called the Arrow Manufacturing Company, and those of Hart & Hegeman to another new company, known as the H. & H. Electric Company, against the issue of all of the shares of these companies respectively. The stock so to be issued by these two new holding companies was, by the direction of the original holding company, issued directly to its stockholders. As soon as this transfer of all its assets had been made to the two new holding companies by the old one, the latter by corporate action dissolved. Thereafter, pursuant to directors' action, the stockholders, preferred and common, of the four companies having an interest in the assets (Arrow, Hart & Hegeman, Arrow Manufacturing Company, and the H. & H. Electric Company) approved a merger agreement whereby the petitioner, The Arrow-Hart & Hegeman Electric Company, was formed, which directly owned in its own right all of the assets formerly belonging to Arrow and to Hart & Hegeman. These transactions were consummated on or prior to December 31, 1928, except that the dissolution of the first holding company did not become final until April 11, 1929, the law of Connecticut providing that a final certificate of dissolution should not issue until four months after the filing of the resolution for dissolution.

January 11, 1929, counsel notified the Commission of the dissolution of the holding company and the formation of the petitioner. June 29, 1929, the Commission issued a supplemental complaint, entitled jointly against the holding company (the original respondent) and the petitioner (the corporation formed by the merger). After reciting in greater detail than above set forth the action taken, this complaint asserted that the formation of the petitioner was brought about by the contrivance and at the instigation of the holding company; that the conveyance of the stocks of Arrow and Hart & Hegeman to the two new holding companies failed to restore the assets

to the ownership and control of separate groups in the manner the shares were held and controlled before the formation of the original holding company; that the result of the whole plan was not a restoration of competition as required by the act of Congress, and that the Commission's jurisdiction having timely attached could not be ousted by the steps subsequently taken.

Petitioner answered the supplemental complaint, the matter was heard, and the Commission made its findings. In addition to the facts above recited, the Commission found that at the time of the acquisition of the stocks of Arrow and Hart & Hegeman by the holding company, those corporations were in direct and substantial competition in interstate commerce, and after the formation of the holding company competition between them had been substantially curtailed. The Commission concluded: The acquisition by the holding company of the shares of the two manufacturing companies might substantially lessen competition between them, restrain interstate commerce, and create a monopoly; the divestment by the holding company was not a compliance with the Clayton Act; the petitioner was organized by the holding company, and its creation was an artifice to evade the provisions of §§ 7 and 11 of the Clayton Act; and the effect of the organization of the petitioner and " the acquisition by it of the common or voting stocks of " Arrow and Hart & Hegeman has been, is, and may be to suppress competition between the two manufacturing companies, to restrain interstate commerce, and to create a monopoly.

The Commission entered an order commanding the petitioner to cease and desist from violation of the provisions of § 7 of the Clayton Act, and to divest itself " of all the common stock of " Hart & Hegeman " so as to include in such divestment " the said company's manufacturing plants and equipment, and all other property necessary to the conduct and operation thereof as a complete

going concern, and so as neither directly nor indirectly to retain any of the fruits of the acquisition of common stock of Hart & Hegeman; or, in the alternative, to divest itself of " all the common stock of " Arrow in the same manner. It was further ordered " that such divestment of the common stock or assets " of Arrow or Hart & Hegeman, as the case might be, should not be made directly or indirectly to the petitioner or any stockholders, officers, employees, or agents of or under the control of the petitioner.

The findings with respect to the effect of the acquisition and ownership by the holding company of the shares of the two manufacturing corporations are attacked as unsupported in fact and unjustified in law. The record is said to disclose that competition was not in fact diminished but preserved. And it is further argued that if competition was or might be in some measure curtailed by the device of a holding company the result is unimportant and insignificant unless the public was injured, and not only is there a total absence of proof of injury to the public, but much affirmative evidence that consumers were benefited by reduction of prices consequent on manufacturing efficiency made possible by unified control.

It is unnecessary to discuss or to decide the questions thus raised, for we think the Commission lacked authority to issue any order against the petitioner.

Section 7 of the Clayton Act forbids any corporation to acquire the whole or any part of the share capital of two or more corporations, where the effect of the acquisition or the use of the stock by voting or otherwise may be to substantially lessen competition between such corporations, restrain competition in interstate commerce or create a monopoly in any line of commerce. Section 11 [3] specifies the remedy which the Commission may apply,

---

[3] U.S.C., Title 15, § 21.

namely, that it may, after hearing, order the violator to divest itself of the stock held contrary to the terms of the Act. The statute does not forbid the acquirement of property, or the merger of corporations pursuant to state laws, nor does it provide any machinery for compelling a divestiture of assets acquired by purchase or otherwise, or the distribution of physical property brought into a single ownership by merger.

If, instead of resorting to the holding company device, the shareholders of Arrow and Hart & Hegeman had caused a merger, this action would not have been a violation of the Act. And if, prior to complaint by the Commission, the holding company, in virtue of its status as sole stockholder of the two operating companies, had caused a conveyance of their assets to it, the Commission would have been without power to set aside the transfers or to compel a reconveyance. *Thatcher Mfg. Co.* v. *Federal Trade Comm'n*, 272 U.S. 554, 560, 561.

Clearly, also, if the holding company had, before complaint filed, divested itself of the shares of either or both of the manufacturing companies, the Commission would have been without jurisdiction. And it might with impunity, prior to complaint, have distributed the shares it held pro rata amongst its stockholders. The fact that in such case the same group of stockholders would have owned shares in both companies, whereas theretofore some owned stock in one corporation only, and some held stock solely in the other, would not have operated to give the Commission jurisdiction. For if the holding corporation had effectually divested itself of the stock, the Commission could not deal with a condition thereafter developing although thought by it to threaten results contrary to the intent of the Act. Compare *National Harness Mfrs. Assn.* v. *Federal Trade Comm'n*, 268 Fed. 705; *Chamber of Commerce* v. *Federal Trade Comm'n*, 280 Fed. 45.

Moreover, the holding company could have ousted the Commission's jurisdiction after complaint filed, by divesting itself of the shares, for that was all the Commission could order. And if it had so divested itself the transferees of the shares could immediately have brought about a corporate merger without violating the Clayton Act. We think that is precisely the legal effect of what was done in the present case. The holding company divested itself of the shares, and thereafter the owners of these common shares united with the holders of the preferred shares to bring about a merger.

The Commission apparently was doubtful of its authority to promulgate the order which it entered. This is evidenced by the terms of the findings and the order. In its final conclusion the Commission refers to "the acquisition by the said new respondent [the petitioner] through merger, of the common or voting stocks of the said Hart & Hegeman Manufacturing Company and Arrow Electric Company . . .," and denominates this a violation of § 7 of the Clayton Act. This, of course, is in the teeth of the obvious fact that the petitioner never acquired the stock of either Arrow or Hart & Hegeman. In its order the Commission directs that the petitioner cease and desist from violation of the provisions of § 7 of the Act, and "divest itself absolutely, in good faith, of all common stock of the Hart & Hegeman Manufacturing Company acquired by it as a result of the merger"; and then adds that it shall do this so as to include in such divestment the manufacturing plants and assets of Hart & Hegeman; and in the alternative the order applies to the stock and manufacturing plants of Arrow. This is a tacit admission that the Commission is without jurisdiction to act unless the alleged violator holds stocks of other corporations. The Commission's own findings show that the petitioner never held any stock of either company, but the

order, nevertheless, requires that the petitioner divest itself of those stocks.

The argument on behalf of the Commission is that while it is true the petitioner never owned any stock of Arrow or Hart & Hegeman, the holding company, against whom the complaint was originally directed, did hold such stocks·in violation of the statute when the proceeding was initiated; and, instead of parting with the shares in good faith, ineffectually attempted to alter the status by initiating and carrying through the merger, the dissolution of which is the aim of the Commission's order.

We think the Commission's premise with respect to the activities of the holding company in bringing about the merger is without support. When the Commission filed its complaint those who had previously been the common stockholders of Arrow and Hart & Hegeman, respectively, had become the owners of the shares of the holding company. While those shares represented at two removes the physical assets of the enterprise, they nevertheless evidenced the equity ownership of those assets. At that time.Arrow and Hart & Hegeman were still separate corporate entities, and about 73% of their outstanding capital stock was preferred stock held by the public, in no wise affected by the creation of the holding company. After the holding company had conveyed the Arrow stock to a new holding company, and the Hart & Hegeman stock to another new holding company, the only persons who could bring about a merger and consequent consolidation of assets were the preferred and common stockholders of Arrow and Hart &. Hegeman. Under the laws of Connecticut two-thirds of the outstanding stock of each class had to vote affirmatively to authorize a merger. While the holding company proposed the plan for accomplishing a merger, and sponsored the preliminary steps to that end, obviously that company had no power to consum-

mate it. That power resided in the equity owners of the assets, the preferred and common stockholders of Arrow and Hart & Hegeman. The common stockholders acted through the two holding companies, but the ultimate decision and action was theirs, through whatever instrumentality effected. Quite as vital to the accomplishment of the plan was the consent of preferred stockholders. It is true the consent was given through execution of proxies; but the shareholders were at liberty to give or to withhold their proxies, and it would be quite beyond reason to hold, as the Commission suggests, that all corporate entities and all stockholder relationship to the property should be disregarded and the original holding company be treated as the sole and efficient agent in the accomplishment of the merger. To do this would be to disregard the actualities, including the fact that the holding company had been effectually dissolved before the merger was voted upon by any of those having an equity interest in the assets.

But if we assume that the holding company against which the complaint was originally directed, brought about a change in legal status, so that before the Commission acted that company ceased to exist, as did the shares it formerly owned, and a corporation formed by merger held all the assets in direct ownership, the respondent's position is no better. The Commission is an administrative body possessing only such powers as are granted by statute. It may make only such orders as the Act authorizes; may order a practice to be discontinued and shares held in violation of the Act to be disposed of; but, that accomplished, has not the additional powers of a court of equity to grant other and further relief by ordering property of a different sort to be conveyed or distributed, on the theory that this is necessary to render effective the prescribed statutory remedy. Com-

pare *Federal Trade Comm'n* v. *Eastman Kodak Co.*, 274 U.S. 619, 623. Where shares acquired in violation of the Act are still held by the offending corporation an order of divestiture may be supplemented by a provision that in the process the offender shall not acquire the property represented by the shares. *Federal Trade Comm'n* v. *Western Meat Co.*, 272 U.S. 554. In the present case the stock which had been acquired contrary to the Act was no longer owned by the holding company when the Commission made its order. Not only so, but the holding company itself had been dissolved. The petitioner, which came into being as a result of merger, was not in existence when the proceeding against the holding company was initiated by the Commission, and never held any stock contrary to the terms of the statute. If the merger of the two manufacturing corporations and the combination of their assets was in any respect a violation of any anti-trust law, as to which we express no opinion, it was necessarily a violation of statutory prohibitions other than those found in the Clayton Act. And if any remedy for such violation is afforded, a court and not the Federal Trade Commission is the appropriate forum. Compare *Federal Trade Comm'n* v. *Western Meat Co., supra.*

The judgment is

*Reversed.*

Mr. Justice Stone, dissenting.

I think the decree should be affirmed.

While this proceeding was pending before the Federal Trade Commission to compel a holding company to divest itself of the controlling common stock of two competing corporations which it had acquired in violation of § 7 of the Clayton Act, that stock was used to effectuate a merger of the competing corporations. It is now declared that, however gross the violation of the Clayton Act, how-

ever flagrant the flouting of the Commission's authority, the celerity of the offender, in ridding itself of the stock before the Commission could complete its hearings and make an order restoring the independence of the competitors, leaves the Commission powerless to act against the merged corporation. This is the case, it is said, because the Clayton Act does not, in terms, forbid mergers, which may be formed by the stockholders of independent competing corporations; and, since the holding company was not the "sole and efficient agent in the accomplishment of the merger," which was affected upon the consent of the various classes of stockholders of the merged companies, it is concluded that the holding company, by its divestment of the stock, complied with the Clayton Act and in effect did "all the Commission could order," so there is no longer any ground for complaint. Further, notwithstanding the authority broadly conferred on the Commission "to enforce compliance" with § 7 "whenever . . . any person . . . has violated" its provisions, it is said that as the statute in terms specifies only a single method by which compliance can be compelled—ordering the offender to divest itself of the stock—the Commission can make no other form of order.

Apart from the objection that the decision now reached is calculated to encourage hasty and ill considered action by the Commission in order to avoid defeat of its jurisdiction by the adroit manipulations of offenders against the Clayton Act, I am unable to construe so narrowly a statute designed, as I think, to prevent just such suppression of competition as this case exemplifies.

1. It is true that the Clayton Act does not forbid corporate mergers but it does forbid the acquisition by one corporation of the stock of competing corporations so as substantially to lessen competition. It follows that mergers effected, as they commonly are, through such ac-

quisition of stock necessarily involve violations of the Act, as this one did. Only in rare instances would there be hope of a successful merger of independently owned corporations by securing the consent of their stockholders in advance of the acquisition of a working stock control of them. Hence the establishment of such control by the purchase or pooling of the voting stock, often effected in secrecy, is the normal first step toward consolidation. It is by this process that most corporate consolidations have been brought about, often by adding one consolidation to another through periods of years. Compare *Standard Oil Co.* v. *United States*, 221 U.S. 1; *United States* v. *American Tobacco Co.*, 221 U.S. 106; *United States* v. *U.S. Steel Corp.*, 251 U.S. 417; see Bonbright and Means, The Holding Company, 30, 50.

Unless we are to close our eyes to this open chapter in the record of corporate concentration, an examination of the legislative history of the Clayton Act, and that of the earlier Sherman Act, can leave no doubt that the former was aimed at the acquisition of stock by holding companies not only as itself a means of suppressing competition but as the first and usual step in the process of merging competing corporations by which a suppression of competition might be unlawfully perpetuated. Thus one of the evils aimed at, the merger of competing corporations through stock control, was reached in its most usual form by forbidding the first step, the acquisition of the stock of a competing corporation, and by conferring on the Trade Commission authority to deal with the violation. It seems plain, therefore, that the illegality involved in acquiring the common stock of the competing companies, which was the first step toward the merger, was neither lessened nor condoned by taking the next and final steps in completing it. There is, then, no basis for contending that the Act has not been violated, or that

the violation has been excused simply because events were pushed to the very conclusion that § 7 was designed to forestall.

2. It is also true that the holding company divested itself of the stock of the two competing operating companies before the Commission had an opportunity to make its order; but it does not follow that it had done all that the Commission could command and that thus the statute was satisfied. Mere divestment of the stock is not enough. The manner of divestment is likewise subject to the requirements of the Clayton Act. This Court has recognized that the purpose of the Act is to restore the competition suppressed by the acquisition of the stock and has specifically held, over objections such as are now made, that the Commission has power not only to order divestment but to prescribe that it shall be done in a manner that will restore competition. *Federal Trade Comm'n* v. *Western Meat Co.,* 272 U.S. 554.

Here the Commission has held that the divestment was not a compliance with the statute. In determining whether it was right in this conclusion, the manner of divestment and the activity of the holding company after the complaint of the Commission was filed and before the final merger of the two operating companies are of crucial significance.

When the complaint was filed the holding company was in complete control of the two operating companies through ownership of their common stock, which alone had voting power. From the moment of the acquisition of the stock it had been and it continued to be a violator of the Clayton Act. Promptly after the complaint was filed it took measures to secure the fruits of its violation. It first proposed by letter to its stockholders a consolidation of the two operating companies, and at a special meeting its board of directors formulated a detailed plan for merger. This plan involved the organization of the two

new holding companies, the transfer to them respectively by the first holding company of its respective holdings of the common stock in the two operating companies in exchange for the distribution by the new holding companies of their stock to the stockholders of the first holding company. Thus for each share in the first holding company owned by its stockholders they were to receive one share in each of the new holding companies. The original holding company was then to be dissolved and the four remaining companies, the two new holding companies and the two operating companies, were to be merged.

The plan, from the beginning, contemplated that the four companies should be bound by formal agreement to effect the merger. It was adopted at a specially called meeting of the stockholders of the first holding company and was carried into effect under its active direction and control. Before its dissolution, by exercising that control it had created the two new holding companies, committed all four of its subsidiary corporations to the merger both by their corporate action and by binding agreement, and had secured the approval of its action by its own stockholders. It will be observed that the original holding company did not divest itself of the stock of the two competing operating companies in the only manner by which competition could have been restored—by returning the stock to the respective stockholders of the operating companies, from whom it had been secured, or to their successors. Instead, it continued the suppression of competition by placing the stock of the two operating companies respectively in control of the two new holding companies, tied by contract to effect the merger, and by the method of distributing the stock of the new holding companies equally to its own stockholders it lodged common ownership and control of both the new holding companies in the two groups of stockholders of the original operating companies. The first holding company created the two new

ones and throughout guided their policy, as it did that of the two operating companies. Acting in concert and in accord with the prearranged plan, all coöperated in executing it, and all, together with their creature, the merged company, were conscious beneficiaries of the violation of the statute.

By thus manipulating its illegally acquired stock control of the operating companies, the first holding company avoided such a distribution of the stock as would have restored competition, and made easy the merger which, if the stock had been returned to those from whom it had originally been acquired, would have been difficult or impossible. Upon these and other facts, which need not now be detailed, the Commission made its finding, abundantly supported by evidence, that the course of action taken by the holding company was not to restore competition between the operating companies, but was " an artifice and subterfuge designed in an attempt to evade the Clayton Act, to perpetuate the elimination of competition," which it had brought about by the acquisition of the stock of the operating companies.

That the stockholders in the successive holding companies, who were the ultimate owners of the operating companies, consented to all this; that two-thirds of the non-voting preferred stock of the operating companies which had never been lodged in the holding companies consented to it; that the merger might possibly have been effected in some other way, had competitive conditions been restored; all seems without significance. While under local statutes merger could not have been effected without the consent of the preferred stock, equally the consent of the stock acquired through violation of the Clayton Act and its active promotion of the merger were essential to the desired end. A prohibited act is no less illegal because its success involves the coöperation of other actors. It was the suppression of competition

by the holding company, through the use which it made of the illegally acquired stock of the operating companies, and its manner of disposing of the stock so as to continue that suppression, which were violations of the Clayton Act and in conflict with the authority of the Commission. This was not any the less so because others consented.

Doubts whether the divestment effected by the first holding company was all that the Commission could have ordered are dissipated by our decision in *Federal Trade Comm'n* v. *Western Meat Co., supra.* There we upheld an order of divestment which directed that in transferring the stock the respondent corporation could not use it to acquire any of the property of the competing corporation, and that none of the stock could be transferred to anyone having any connection with or in any way under the influence of the offending corporation. Here we need not go so far.

3. There remains the question whether the Commission is now powerless to undo a consummation which, at an earlier stage, it could have prevented. It is said, as a matter of statutory construction, that the grant to the Commission of specific power to command offenders to divest themselves of illegally acquired stock excludes the possibility of its ordering anything more or different, however incidental or necessary it may be to the exercise of the granted power.

It would seem that this point also had been settled by our decision in the *Western Meat Company* case, where the offending company, through stock ownership, had acquired possession of the property and control of the business of a competitor. It wished to be free to divest itself of the stock without restriction, in order that it might acquire ownership of the competitor's property by transferring the stock to hands that would make merger easy. It was argued to us there, as it is here, that the statute

provides only that the Commission may order divestment of the stock; that it does not say that the Commission can command relinquishment of the power, derived from the stock ownership, to bring the competitor, or its property, under the control of the offending corporation, either directly, or through transfer of the stock into friendly hands. But that argument was rejected, and the order directing divestment of both the property and stock by placing both in the hands of those not under the influence or control of the offender was upheld. This Court said, p. 559:

" Further violations of the Act through continued ownership could be effectively prevented only by requiring the owner wholly to divest itself of the stock and thus render possible once more free play of the competition which had been wrongfully suppressed. The purpose which the lawmakers entertained might be wholly defeated if the stock could be further used for securing the competitor's property. And the same result would follow a transfer to one controlled by or acting for the respondent."

No more here, than there, should it be said that the purpose of the statute must be defeated because the lawmakers did not attempt to provide with a meticulous precision how the Commission should proceed in every contingency that might arise. The dominating purpose of the statute is to restore to its original state the competition suppressed by the acquisition of the stock, and, just as we rejected a rigid literalism there in order to effect that purpose, and upheld an order which was but incidental, though necessary, to the effective exercise of the power specifically granted, so we should reject it now. Just as in that case we upheld the Commission's order directing the surrender of one of the fruits of the wrongful stock ownership—the power to place a competing unit under the offender's domination—so should we now sus-

tain the order commanding relinquishment of another of the fruits of that ownership—the accomplished merger.

Even if the question were a new one in this Court, no plausible reason has been advanced for interpreting this remedial statute as though it were a penal law. The Clayton Act was designed to prevent abuses growing from deficiencies due to the generality of the Sherman Act. It sought to accomplish that end by conferring upon the Commission the power to strike at specific practices. In this, as in most schemes for regulation by administrative bodies, there must be a balance between the general and the particular. When the courts are faced with interpretation of the particular, administration breaks down and the manifest purpose of the legislature is defeated unless it is recognized that, surrounding granted powers, there must be a penumbra which will give scope for practical operation. In carrying such schemes into operation the function of courts is constructive, not destructive, to make them, wherever reasonably possible, effective agencies for law enforcement and not to destroy them.

That the merged corporation is different from the original offender should lead to no different conclusion. It is but the creature and *alter ego* of the offender, created by the offender's exercise of power over the illegally acquired stock for the very purpose of perpetuating the suppression of competition which the Commission from the start had power to forbid. To declare that an offender, whose cause is pending before the Commission, can effect through its creatures and agents what it may not itself do, nullifies the statute.

Some scope may be given to the doctrine of *lis pendens*. It is true that the Commission is an administrative body, and not a court. But it exercises many of the powers conventionally deemed judicial. It is authorized to bring offenders before it to determine whether they are violators of the Act and, if so, " to enforce compliance " by

commanding that the violation cease. There is as much reason to believe that Congress did not intend to deny to the Commission the authority to exercise effectively the granted power, and thus to preserve its jurisdiction until its function could be executed, as there would be were similar powers extended to a court of inferior jurisdiction. This is the more evident when it is remembered that obedience to the Commission's orders cannot be compelled without first subjecting them to the scrutiny of a court. Recognition of its authority involves neither departure from accepted principles nor any risk of abuse.

These considerations demand our rejection of the contention that an offender against the Clayton Act, properly brought before the Commission and subject to its order, can evade its authority and defeat the statute by taking refuge behind a cleverly erected screen of corporate dummies.

The CHIEF JUSTICE, MR. JUSTICE BRANDEIS, and MR. JUSTICE CARDOZO concur in this opinion.