**UNITED STATES of America, Plaintiff,**

v.

**The CHELSEA SAVINGS BANK and the Dime Savings Bank of Norwich, Defendants.**

**Civ. No. 12733.**

United States District Court
D. Connecticut.

June 12, 1969.

---

Jon O. Newman, U. S. Atty., John Cassidento, Asst. U. S. Atty., New Haven, Conn., James L. Minicus, Leslie M. Jeffress, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Allyn L. Brown, Jr., Milton L. Jacobson, Gary I. Cohen, Brown, Jacobson, Jewett & Laudone, Norwich, Conn., for defendants.

## RULING ON DEFENDANTS' MOTION TO DISMISS

ZAMPANO, District Judge.

The issue presented by the defendants' motion to dismiss is whether § 7 of the Clayton Act, 15 U.S.C. § 18, is applicable to non-stock mutual savings banks.

On December 18, 1967, the Chelsea Savings Bank and the Dime Savings Bank of Norwich, both mutual savings banks chartered under the laws of Connecticut, entered into an agreement of consolidation. Conn.Gen.Stats. § 36–140. The Banking Commission of Connecticut and the Federal Deposit Insurance Corporation approved the proposed consolidation. Conn.Gen.Stats. § 36–140(5); 12 U.S.C. § 1828(c).

The government seeks to enjoin the proposed consolidation on the grounds that the merger would violate § 1 of the Sherman Act, 15 U.S.C. § 1, and § 7 of the Clayton Act. The defendant banks have moved to dismiss the government's cause of action alleging a violation of § 7 of the Clayton Act.

The Clayton Act, enacted in 1914, prohibited the acquisition of "stock or other share capital" by a corporation where the effect might be to substantially lessen competition or tend to create a monopoly. Since bank amalgamations were effected primarily through statutory mergers, § 7 of the Act was regarded as inapplicable to bank mergers. See Arrow-Hart & Hegeman Elec. Co. v. FTC, 291 U.S. 587, 595, 54 S.Ct. 532, 78 L.Ed. 1007 (1934). In 1950, because of "a fear of what was considered to be a rising tide of economic concentration in the American economy," Brown Shoe Co. v. United States, 370 U.S. 294, 315, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962),

Congress amended § 7 by adding the language underlined:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital *and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets* of another corporation engaged also in commerce, where *in any line of commerce in any section of the country* the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Thus the dominant purpose of the 1950 amendment was to provide "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." Brown Shoe Co. v. United States, supra, at 317, 82 S.Ct. at 1520; see generally, Lifland, The Supreme Court, Congress and Bank Mergers, 32 Law & Contemp. Prob. 15, 16–17 (1967).

In 1963 the Supreme Court in United States v. Philadelphia National Bank, 373 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915, made it clear that bank mergers were subject to attack under § 7 of the Clayton Act. Reviewing the legislative history of the Act, the Court concluded:

> * * * Congress primarily sought to bring mergers within § 7 and thereby close what it regarded as a loophole in the section. * * * In other words, Congress contemplated that the 1950 amendment would give § 7 a reach which would bring the entire range of corporate amalgamations, from pure stock acquisitions to pure assets acquisitions, within the scope of § 7. Thus, the stock-acquisition and assets-acquisition provisions, *read together*, reach mergers, which fit neither category perfectly but lie somewhere between the two ends of the spectrum. 374 U.S. at 341–342, 83 S.Ct., at 1730.

Recognizing the formidable language of the Supreme Court in *Philadelphia Bank,* the defendants nevertheless attempt to limit the ruling to mergers involving stock companies. They argue that the statutory consolidation of non-stock corporations, as in the instant case, is beyond the reach of § 7. The Court disagrees.

 It is true that *Philadelphia Bank* involved the merger of two commercial banks, but no sound reason supports a ruling limiting its rationale to amalgamations of banks which issue stock. The broad sweep of the Supreme Court's language clearly indicates a judicial disinclination to imply immunity from the antitrust laws when banks merge. There is little question that the Supreme Court was primarily concerned with the substantive effect of a merger in consolidating the economic power of two corporations, rather than with the procedure through which the consolidation of power was effected. The Court expressly warns against any evasive corporate maneuvers designed to avoid § 7:

> * * * True, an exchange of its stock for assets would achieve the acquiring bank's objectives. We are clear, however, that in light of Congress' overriding purpose, in amending § 7, to close the loophole in the original section, if such an exchange (or other clearly evasive transaction) were *tantamount in its effects to a merger,* the exchange would not be an "assets" acquisition within the meaning of § 7 but would be treated as a transaction subject to that section. (emphasis supplied). 374 U.S. at 344, n. 22, 83 S.Ct., at 1731.

 In the instant case, the consolidation transaction will combine the economic power of the two defendant banks. Their agreement provides:

> At the close of business on the said date of (consolidation), all of the assets of the CHELSEA and all of the assets of the DIME shall be and become the property of the CONSOLIDATED BANK, and said CONSOLI-

DATED BANK shall be and become liable for all of the deposits and all liabilities and obligations of both the CHELSEA and the DIME.

The resulting bank is to be known as The Chelsea-Dime Savings Bank and plans to continue operations with Chelsea's banking facility as its main office and Dime's as a branch office. A single board of directors will manage the affairs of the new bank. Consequently, the consolidation is "tantamount in its effects to a merger" and should be tested by the standards set forth in § 7.

Moreover, although a mutual savings bank has a corporate structure which differs from that of a stock bank, the distinctions between the two corporate forms, in the light of the purposes of § 7, have little practical significance. A savings bank receives money in trust and "the depositors stand in the same relation to the bank as the stockholders of an ordinary bank." Lippitt v. Ashley, 89 Conn. 451, 488, 94 A. 995, 1016 (1915). Under Connecticut law, the depositors of a savings bank, like shareholders of other banks, have incidents of ownership in the bank's capital, and upon liquidation they take their ratable share only from the surplus remaining after payment of the "charges and expenses of settling its affairs (and) all other liabilities * *." Conn.Gen.Stats. § 36–51: see Bank Commissioners v. Watertown Savings Bank, 81 Conn. 261, 70 A. 1038 (1908). As with stockholders, depositors may be divided into classes "according to the duration or type of their deposit balances with the savings bank," and they may be paid differing pro rata dividends. Conn.Gen.Stats. § 36–139(1), (2). All surplus accounts in excess of 25% of deposits must be divided among the depositors entitled to a dividend. Conn.Gen.Stats. § 36–139(1) (e). Thus, although the depositors' interest in the bank's surplus is not readily saleable in the market, their form of shared ownership of the capital should be deemed to be "share capital" under the provisions of § 7 of the Clayton Act. See 30 Geo. Wash.L.Rev. 1024, 1027–28 (1962). Since the defendants are acquiring the "share capital" of each other through a statutory procedure tantamount in effect to a merger, the competitive effects of the transaction should be subjected to scrutiny under § 7.

In addition to judicial interpretations of the antitrust laws, post-*Philadelphia Bank* legislation clearly indicates Congress' acknowledgment that consolidations of mutual savings banks are within the reach of § 7. As a response to *Philadelphia Bank,* Congress amended the Bank Merger Act, 12 U.S.C. § 1828 (c), in 1966 "to clarify the applicability of the antitrust laws to bank mergers." See Via, Antitrust and the Amended Bank Merger and Holding Company Acts: The Search for Standards, 53 Va.L.Rev. 1115 (1967); Comment: The 1966 Bank Merger Act, 66 Colum.L.Rev. 764 (1966). The 1966 Bank Merger Act provides that even anticompetitive bank mergers may be approved by the supervising administrative agencies and by the courts if they find

> that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served. 12 U.S.C. § 1828(c) (5) (B), (7) (B).

Congress expressly included mutual savings banks within the ambit of this amendment. 12 U.S.C. § 1813(a), (f), (h).

Therefore it is reasonable to conclude that all bank mergers should be subjected to consistent antitrust treatment under § 7 of the Clayton Act, whether or not the banks involved issue stock.

Accordingly, defendants' motion to dismiss is denied.