GREATER DETROIT RESOURCE RECOVERY AUTHORITY and Combustion Engineering, Inc., Plaintiffs,

v.

Valdas V. ADAMKUS and United States Environmental Protection Agency, Defendants.

No. 86–CV–72910–DT.

United States District Court, E.D. Michigan, S.D.

Dec. 17, 1987.

---

Steven Weyhing, John D. Pirich, Lansing, Mich., Stanley M. Gorinson and Joseph A. Cannon, Kevin Sullivan and Steve Christiansen, Washington, D.C., for plaintiffs.

Geneva Halliday, Asst. U.S. Atty., Detroit, Mich., Eric J. Cohen, Asst. Reg. Coun., U.S.E.P.A., Chicago, Ill., and Michael Wenig, U.S. Dept. of Justice, Natural Resources Div., Environmental Defense Sec., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR COSTS AND ATTORNEY FEES

HACKETT, District Judge.

This case is presently before the court on plaintiffs' motion for costs and attorney fees. For the reasons stated below, the motion of the Greater Detroit Resource Recovery Authority and that of Combustion Engineering, Inc. is granted.

### BACKGROUND

The lawsuit underlying this application for costs and attorney fees was brought by plaintiffs Greater Detroit Resource Recovery Authority (GDRRA) and Combustion Engineering, Inc. (C–E). Greater Detroit Resource Recovery Authority is a public body created by the cities of Detroit and Highland Park. It is authorized by its charter to acquire, construct and equip a municipal solid waste combustion facility in Detroit, to acquire or lease the site for that facility, and to issue revenue bonds to defray the costs of the facility. At the time this lawsuit was commenced, GDRRA allegedly had four employees to carry out this task and a net worth of approximately zero. C–E has been retained by the GDRRA to construct a solid waste combustion facility and will also manage, operate,

and maintain the facility after its completion.

42 U.S.C. § 7475 requires that all major emitting facilities on which construction is commenced after August 1, 1977, obtain a permit. To qualify for such a permit, a facility must establish, among other things, that required analyses pursuant to regulations have been completed, that public hearings have been held, and that the proposed facility is subject to the best available control technology (BACT) at the time the permit is issued. Both the statute and its regulations define BACT as a case by case evaluation which takes into account energy, environmental and economic impacts, and other costs. Pursuant to a delegation of authority given by the United States Environmental Protection Agency (EPA), the authority to issue permits for such facilities was given to the State of Michigan. *Federal Register*, Vol. 45. No. 27, February 7, 1980. This delegation was based on certain terms and conditions. Included among these terms was the condition that:

 if the State enforces the delegated provisions in a manner inconsistent with the terms and conditions of this delegation or the Clean Air Act, USEPA may exercise its enforcement authority pursuant to Section 113 of the Clean Air Act with respect to sources within the State of Michigan subject to PSD provisions.

(Paragraph Seven of the delegation agreement). Paragraph Eight of the delegation agreement provides:

If the Regional Administrator determines that the State is not implementing or enforcing the PSD program in accordance with the terms and conditions of this delegation the requirements of 40 CFR Section 52.21, or the Clean Air Act, this delegation, after consultation with the AQD, may be revoked in whole or in part. Any such revocation shall be effective as of the date specified in a Notice of Revocation to the State.

On or about August 1, 1983, C–E filed an application with the Air Quality Division (AQD) of the Michigan Department of Natural Resources (MDNR) for a permit to install an incinerator on a 17 acre site in an area bounded by the I–94 freeway to the north, Ferry Street to the south, the Grand Trunk Railway to the east and Russell Street to the west. Prior to approving the permit, MDNR required C–E to supplement its application with additional information on at least three separate occasions. A notice of public hearing was published on September 13, 1984, which provided a thirty-day period for public comment on the proposed facility and for a public hearing to be held on October 16, 1984. The EPA was provided with a notice of these dates and with the State of Michigan's staff analysis of the facility. The EPA submitted no comments to the State of Michigan. After comprehensive review, *which included an inquiry into the feasibility of using lime spray dry scrubbers*, which was rejected, the AQD of the MDNR granted C–E a permit to construct the facility. To finance construction of the facility, the GDRRA then issued bonds amounting to one-half a billion dollars. (Closing of the permanent financing did not occur until May 7, 1986, through the breaking of escrow for the proceeds of the initial bonds and the remarketing to the public of permanent bonds in the amount of $438,000,-000.)

During April 23–25, 1985, the EPA conducted an audit of MDNR's new source review program. The auditors report stated:

The MDNR is commended for the continuing dedication of its staff to the task of making and documenting complete reviews of new source applications. As has been reported in earlier audits, the Staff Activity Reports which are on file for all sources submitted for review by the Michigan Air Pollution Control Commission (MAPCC) are noteworthy efforts to document all factors considered in reviews of such applications. This audit revealed no real departures from observance of and adherence to continuing good practices.

In addition to the general audit of MDNR's procedure, the EPA also audited five permits, one of which was the permit issued to

GDRRA. After a review of the air quality analyses performed to support the permits, the EPA concluded that "MDNR continues to competently perform the air quality analyses required by the regulations, and a general impression obtained from the audit is that there has been an increase in State activity in performing independent internal reviews of modeling analyses contained in permit applications." The EPA auditors did note, however, that in some instances, as in the case of the GDRRA facility, the MDNR had substituted existing data without a showing it was "representative."

On December 18, 1985, Gerald Avery, supervisor of the permit section of the Air Quality Division (AQD) of the MDNR, sent a letter to C–E and to the City of Detroit on the letterhead of Ronald A. Skoog, director of the AQD of the MDNR, which stated:

The letter of 18 December 1985 from the Department of Natural Resources technical staff was intended to inform you of our discovery of information which indicates that technology other than that approved in your Permit No. 468–83 may better control emission levels from resource recovery facilities. This does not imply that the proposed Detroit facility is unsafe. *To the extent that this letter implied that we would request the Commission to modify Permit No. 468–83 to change the air pollution technology required, I regret the confusion this has caused. We recognize that your permit cannot be revised solely because of our finding that a new best available control technology should apply to future waste facilities.* Given these facts, the DNR does not intend to pursue the issue of permit modification further. (Emphasis ours.)

Although the MDNR, through Ronald Skoog, recognized that lime scrubbers were BACT for future waste facilities only, a public meeting was held on April 9, 1986, by the Michigan Air Pollution Commission to discuss the facility. The EPA was given notice of this meeting but was unable to send a representative. The EPA did send written testimony which they wished read into the record of the meeting. The testimony was that of Joseph Paisle, Chief of the Technical Analysis Section in the Air Management Division of EPA, Region V. Paisle's testimony stated that a review had been conducted by the EPA of the Resource Recovery Facility which "identified several deficiencies in the construction permit." In regard to the facility's sulfur dioxide emissions, Paisle testified:

It is USEPA's determination that the BACT analysis conducted for this facility was not adequate to meet the requirements of the Clean Air Act. Specifically, the analysis contained only a cursory review of the control technology alternatives rather than the detailed analysis of alternatives required by the Clean Air Act and the PSD regulations. The sulfer dioxide emission limit contained in the permit is therefore unsubstantiated and the permit itself is therefore deficient in this regard.

At the close of the April 9, 1986, meeting the State determined by a vote of 9–1 that there was no basis for the commencement of a proceeding to reconsider the permit.

C–E responded to EPA's statements by letter dated April 18, 1986. Additionally, on April 23, 1986, Bella I. Marshall, chairperson of GDRRA, wrote defendant Valdus Adamkus, Administrator of EPA, Region V, expressing her concern over the uncertainty of the permit's status at a time when the mandatory redemption period of the bonds financing the facility was imminent. Marshall requested a prompt resolution of the issue so as not to interfere with the redemption of the bonds. Meetings were held to resolve the dispute but no formal response was made by the EPA.

On May 8, 1986, the Audubon Society, the Environmental Defense Fund, the Sierra Club and the North Cass Community Union (community groups) sent a letter to the EPA indicating their intent to initiate suit against the EPA pursuant to Section 304(b) of the Clean Air Act (CAA), 42 U.S.C. § 7604(b) and 40 CFR Part 54 for EPA's failure to enforce the CAA's standards for new facilities. The community groups included a memorandum indicating specific

concerns. A copy of this memorandum has never been provided to this court.

On or before May 9, 1986, construction on the GDRRA facility began.

On May 20, 1986, EPA sent a letter to the GDRRA and to the chief of the AQD of MDNR which stated that "[b]ecause of technical and procedural questions" the EPA thereby *revoked* the PSD delegation with respect to the GDRRA facility only pursuant to Section Eight of the delegation agreement (quoted in full on page 3 herein). The EPA indicated that a copy of the partial delegation revocation would soon appear in the *Federal Register* along with the proposed permit revocation. No such publication was ever made.

On July 7, 1986, plaintiffs initiated the instant action seeking a declaration from this court that the EPA had exceeded its authority in attempting to revoke the GDRRA permit and to enjoin the EPA from any further attempt to revoke the facility's permit. At a status conference held on August 1, 1986, the parties and court agreed to an expedited schedule. The parties stipulated that plaintiffs' complaint and motion for preliminary injunction would be construed as a motion for summary judgment. Defendant EPA's answer (which had not yet been filed) was to be considered as a cross-motion for summary judgment. The court's decision on these motions was to be dispositive of the entire case. At this conference the court also gave the parties until August 29, 1986, to conduct discovery. At that time the EPA informed the court that it had an "open file" and that plaintiffs were welcome to copies of anything relevant in its possession.

Certain problems arose prior to oral argument on the cross-motions for summary judgment. Plaintiffs were not made aware of the EPA general audit of the MDNR's permitting process nor the audit of the GDRRA's permit (discussed on page four herein) until August 28, 1986, one day before the close of discovery. This contradicted earlier statements made by counsel for EPA that it was not until between December, 1985, and April, 1986, that it

had even looked at the GDRRA permit. Plaintiffs further claim that the audit was only produced to them when they learned of its existence from other sources and asked for it specifically, although they had requested in discovery any information that EPA possessed regarding the permit. At that time counsel for EPA apologized for their ineptitude but stated that no malice had been intended. On September 10, 1986, the EPA noticed the taking of a deposition *de bene esse* of Gerald L. Avery of the MDNR to take place on September 16, 1986. Since this notice came well after the close of discovery and the EPA could show no reason why it could not have taken the deposition earlier, it was quashed. Around the same time, defendants contacted the plaintiffs and indicated that they were willing to enter into a settlement regarding this case. The parties, with the court's approval, then entered into a stipulation to extend the time in which the EPA's cross-motion for summary judgment was due. All parties represented to the court that they believed a settlement could be effectuated. After the stipulation for extension of time was entered by the court, the EPA informed plaintiffs that they were not willing to have any agreement put into the record in the form of an order. Since plaintiffs had continually maintained the need for "finality" on the issue of their permit, settlement discussions were terminated.

One week prior to the scheduled oral argument on the cross-motions for summary judgment, the EPA issued a letter dated September 19, 1986, withdrawing its May 20, 1986, letter. The September 19, 1986, letter was followed by a press release in which EPA stated that it "reluctantly" withdrew its May 20, 1986, letter because it had just discovered that it had audited the permit in early 1985 and had found it to be satisfactory. At that conference the EPA stated that this court should dismiss this lawsuit as being moot. However, the EPA continued to maintain that it possessed the "inherent" authority to revoke the facility's permit.

During oral argument on the cross-motions for summary judgment counsel for

EPA was unable to state that the EPA had yet made a final determination as to the legality of the facility's permit but could only state that at that point it had an "insufficient basis" to question the validity of the permit. Counsel implied that the EPA, as well as the community groups mentioned on page six, would continue to search for a "sufficient basis" to question the validity of the permit.

In its opinion dated October 21, 1986, this court found that the relief sought by plaintiffs was not moot because of EPA's refusal to admit the validity of the permit and enjoined the EPA from attempting to revoke the GDRRA's permit based on any evidence known or discovered as of that date.

### PRESENT MOTION

Plaintiffs have now moved to recover costs and attorney fees expended in bringing this action. Plaintiffs advance three bases for recovery of these costs: 1) the "American rule" under the common law; 2) under Rule 11 of the F.R.Civ.P.; and 3) under the Equal Access to Justice Act, 28 U.S.C. § 2412 (only GDRRA moves under this section).

### Costs under the Equal Access to Justice Act

28 U.S.C. § 2412(d)(1)(A) provides that:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

Section (d)(2)(A) further provides

"fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project, which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees. (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee);

The primary purpose of these sections is to reduce economic deterrents to contesting unreasonable government actions. Additionally, this section is intended to make whole small businesses and individuals who have been victims of unreasonable government actions. *Kreimes v. Dept. of Treasury*, 764 F.2d 1186, 1190 (6th Cir.1985), *Ellis v. United States*, 711 F.2d 1571, 1571–76 (Fed.Cir.1983). In accordance with this purpose, "party" under subsection (d) is limited to:

an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or any owner of an unincorporated business, or any partnership, corporation, association, unit of local government or organization, the net worth of which did not exceed $7,000,000 *at the time the civil action was filed*, and which had not more than 500 employees at the time the civil action was filed; except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of such Code, or a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141(a)) may be a party regardless of the net worth of such organization or cooperation association;

28 U.S.C. § 2412(d)(2)(B). The GDRRA claims that it is entitled to fees and other expenses, as defined in (d)(2) above.

527

Through the affidavit of Michael Brinker, the GDRRA has established that at the time this lawsuit was filed (July 6, 1986) it had fewer than 500 employees (4 employees) and that it had a net worth which did not exceed $7,000,000 (allegedly zero). In fact, at the time the lawsuit was filed, GDRRA had just issued approximately $500 million in resource recovery bonds. The GDRRA is a party within the meaning of the EAJA. Further, there is no question but that GDRRA was a prevailing party. At issue is whether the position of the United States was "substantially justified."

■ Under the EAJA costs are awarded to a prevailing party *unless* the government establishes that its position was substantially justified. The government bears the burden of showing a reasonable basis in truth for the facts alleged; a reasonable basis in law for the theory it propounds; and, a reasonable connection between facts alleged and legal theory advanced. *Donovan v. Dial America Marketing, Inc.*, 757 F.2d 1376 (3rd Cir.1985); *Hirschey v. F.E. R.C.*, 760 F.2d 305, 309 (D.C.Cir.1985); *Ferrell v. Pierce*, 743 F.2d 454, 466 (7th Cir. 1984); *Trident Marine Const. v. Dist. Eng., U.S. Army*, 587 F.Supp. 799 (W.D.Mi. 1984), *aff'd* 766 F.2d 974 (6th Cir.1985); *Spencer v. N.L.R.B.*, 712 F.2d 539 (D.C.Cir. 1983). Moreover, "a strong showing" must be made to meet this burden." *Environmental Defense Fund v. Watt*, 722 F.2d 1081, 1085 (2nd Cir.1983).

■ The EPA, by issuance of its May 20, 1986, letter indicated its belief that technical and procedural questions in the permitting process for the GDRRA facility existed. EPA adhered to that position until plaintiffs discovered that the EPA had audited the Michigan DNR's general permitting process and the GDRRA's permit and commended the State's process. The fact of this audit was not disclosed by the EPA to plaintiffs who only learned of its existence from another source. When the existence of the audit was disclosed to plaintiffs, the EPA did not challenge its audit or produce any independent evidence (nor did it ever produce evidence of known prob-

lems) but simply and "regretfully" withdrew its letter.

The EPA's position on the law throughout this litigation was that it possessed "the inherent authority" to withdraw the facility's permit at any time. However, it is well established that as creatures of Congress, administrative agencies have no "inherent power", but only that power specifically delegated to them. *Arrow–Hart & Hegeman Electric Co. v. FTC*, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007 (1934); *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *FTC v. Raladam Co.*, 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); *Social Security Board v. Nierotko*, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

The EPA had no justification, factual or legal, for its actions.

■ The EAJA provides that an award of fees and expenses is not appropriate, even if the government's position was not substantially justified, if special circumstances make an award of such fees unjust. The EPA argues that it would be unjust to award fees against it because its actions in this case were due to pressures from community/environmental groups who threatened to sue the EPA for alleged deficiencies in the permit. The EPA states "the Agency was seriously concerned about carrying out its responsibilities to the public to investigate alleged deficiencies in this permit." However, when challenged by the community groups the EPA did not seek to investigate their conclusory allegations or disclose to the groups that it had audited the permitting process and found it to be satisfactory. Instead, with no evidence to support the community groups' allegations and with no opportunity for a pre-revocation hearing, the EPA revoked the PSD delegation with respect to the GDRRA facility. The EPA has never alleged that it had any basis to revoke the permit, but did so only to appease the community groups with the hope that evidence could be discovered later. The procedure used by the EPA violates all notions of fundamental fairness. It clearly would be unjust *not* to award attorney fees and ex-

penses to the GDRRA under the EAJA, 28 U.S.C. § 2412(d).

### The American Rule

Unlike § 2412(d), Section 2412(b) has no special eligibility requirements. "Award of Attorney Fees and other Expenses in Judicial Proceedings under the Equal Access to Justice Act," U.S. Dept. of Justice, Office of Legal Policy. Under subsection (b) any prevailing party may recover costs and attorney fees against the government to the same extent that any other party would be liable under the common law. Defendant C–E argues that under the common law bad faith exception to the American Rule, they are entitled to costs and attorney fees under subsection (b).[1]

■ Under the "American Rule" a "prevailing party" is ordinarily not entitled to collect a reasonable attorney fee from the loser. *Alyeska v. Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *Arcambel v. Wiseman,* 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796). However, there are significant exceptions to this rule. A major exception is that courts are empowered to award fees against a losing party that has acted in bad faith. *Shimman v. Intern. Union of Operating Eng., Loc. 18,* 744 F.2d 1226, 1229–1234 (6th Cir.1984) citing *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

> The bad faith considered by courts construing this exception generally falls within one of three categories: (1) bad faith occurring during the course of litigation; (2) bad faith in bringing an action or in causing an action to be brought; and (3) bad faith in the acts giving rise to the substantive claim.

*Shimman,* at 1230. However, *Shimman* went on to overrule some earlier precedents in holding "that the bad faith exception to the American Rule does not allow an award of attorney fees based *only* on bad faith in the conduct giving rise to the underlying claim." *Id.* at 1233 (emphasis ours).

■ In the present action, the record as a whole demonstrates that bad faith on the part of the government occurred in each category of proceedings outlined in *Shimman.* For example, during the course of the litigation, the government failed to disclose the existence of its audit of the MDNR permitting process. Once plaintiffs discovered the audit, the EPA withdrew its May 20, 1986, letter in an attempt to make this lawsuit moot while continually maintaining its right to reissue the letter, or revoke the facility's permit at any time. This conduct left a cloud of uncertainty hanging over the facility. Another example of bad faith is the EPA's agreement to "settle" this lawsuit, but failing to notify the court or opposing counsel until after its response date was adjourned that it refused to allow the terms of any settlement to be entered in the form of an order, and refused the entry of a judgment. Again, the EPA sought a way to stop this lawsuit but continue its conduct despite its statement on the record that it had no evidence of any fraud, misrepresentation or even mistake in the manner in which this permit was granted.

The EPA also evidenced bad faith in causing this action to be brought. EPA repeatedly emphasizes that it never actually revoked the PSD delegation with respect to the facility, but only issued its May 20, 1986, letter of intent to revoke. Contrary to EPA's position that this evidences a lack of bad faith, this emphasizes the EPA's attempt to make a stand without taking a position. Through its May 20, 1986, letter, the government put the validity of the GDRRA facility's permit into question. Then with $50 million in bonds ready to be reissued, the EPA did nothing. It did not revoke the permit, did not withdraw the May 20, 1986, letter (prior to litigation), nor make any effort to resolve the matter. Instead, the EPA challenged the validity of the permit, but due to its inaction left the plaintiffs with no available administrative remedy. If defendants were private individuals, there is no question but that attor-

---

1. Since this court has found that GDRRA is entitled to costs and attorney fees under the less stringent standard espoused in subsection (d), we will not address their eligibility under subsection (b).

ney fees under the bad faith exception to the American Rule would be awarded to plaintiff C–E. EPA is therefore liable in this fact situation under 28 U.S.C. § 2412(b).

*Rule 11 Sanctions*

Since this court has found that plaintiffs will recover costs and attorney fees under the Equal Access to Justice Act or Section 2412(b), it is not necessary to address plaintiffs' attempt to recover such costs as Rule 11 Sanctions.

IT IS ORDERED that Greater Detroit Resource Recovery Facility's motion for costs and attorney fees under 28 U.S.C. § 2412(d) is granted.

IT IS ALSO ORDERED that Combustion–Engineering's motion for costs and attorney fees under the bad faith exception to the American Rule is granted.

IT IS FURTHER ORDERED that plaintiffs submit their Bill of Costs to this court within forty-five days of the date of this order. If plaintiffs seek attorney fees in excess of the $75 hourly rate, they should address those factors provided for in 28 U.S.C. § 2412(d)(2)(A) which could justify a higher rate.

Defendants shall have forty-five days from the date that plaintiffs file their Bill of Costs to file objections to plaintiffs' documents.