ENVIRONMENTAL DEFENSE FUND,
INC. et al., Plaintiffs,

v.

James G. WATT, et al., Defendants.

No. CV 81–2729.

United States District Court,
E.D. New York.

Oct. 22, 1982.

Edward Lee Rogers, Washington, D.C., Michael J. Bean, Environmental Defense Fund, Washington, D.C., James T.B. Tripp, Environmental Defense Fund, New York City, for plaintiffs.

Raymond J. Dearie, U.S. Atty. by Ben Wiles, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

GEORGE C. PRATT, Circuit Judge.*

On March 29, 1982, the court entered an order dismissing this case without prejudice based upon a stipulation of settlement filed by the parties on March 26, 1982. By motion submitted on April 29, 1982, plaintiffs now seek to recover $24,398.27 in attorneys' fees and expenses, in addition to their costs, under § 204(a) of the Equal Access to Justice Act, Pub.L. No. 96–481, 94 Stat. 2325, codified at 28 U.S.C. § 2412 (West Supp. 1981). For the reasons set forth below, plaintiffs' motion is granted.

In late July, 1981, the United States Fish and Wildlife Service issued two permits authorizing the Suffolk County Vector Control Commission (Suffolk County) to spray certain chemical insecticides on the Seatuck and Wertheim National Wildlife Refuges. These permits, which specifically authorized aerial application of the insecticides, were scheduled to expire on September 30, 1981. On August 10, 1981, two additional permits were issued, permitting Suffolk County to hand clean certain ditches on the Seatuck and Wertheim refuges and to hand apply insecticide to localized mosquito larval concentrations. Pursuant to these permits, Suffolk began applying insecticide to the Seatuck refuge.

On August 20, 1981 plaintiffs, the Environmental Defense Fund and three other national environmental organizations, initiated the instant action against James G. Watt, Secretary of the Interior, and other federal officials, seeking declaratory and injunctive relief to prevent the spraying of the insecticides.[1] Plaintiffs expressed particular concern about the type of insecticide to be used and challenged the issuance of the permits on the grounds that the federal defendants had failed to comply with the procedural requirements established by various federal environmental statutes, including the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and the National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd, et seq., and appropriate regulations promulgated thereunder. In addition, plaintiffs alleged that defendants had disregarded a parallel set of limitations set forth in the Fish and Wildlife Service's "Final Recommendations on the Management of the National Wildlife Refuge System" (Final Recommendations). Specifically, plaintiffs claimed that defendants could not have lawfully issued the permits without first (1) preparing an environmental assessment or an environmental impact statement; (2) considering alternative biological pesticides; and (3) considering whether the use of chemical pesticides was consistent with the purposes of the wildlife refuges.

On August 21, 1981 the court heard oral argument on plaintiffs' application for a temporary restraining order. At that time, counsel for the federal defendants represented to the court that no further spraying would take place without 48-hours' notice to the plaintiffs. In view of this representation, and in part because the plaintiffs had neglected to join Suffolk County as a party defendant, the court denied the application. Several days later, plaintiffs filed an

---

* Of the U.S. Court of Appeals, Second Circuit, sitting by designation.

1. In addition to seeking to prevent the application of chemical pesticides to the Seatuck and

Wertheim refuges, the plaintiffs' complaint sought to prospectively enjoin the federal defendants from authorizing the use of these pesticides on the Fire Island National Seashore.

amended complaint including Suffolk County and several local officials as defendants, and a hearing on plaintiffs' application for a preliminary injunction was then scheduled for September 3, 1981. By letter dated August 28, 1981, however, Suffolk County informed the Fish and Wildlife Service that it foresaw "no future need for mosquito control measures" at the Seatuck and Wertheim refuges. Accordingly, on September 1, 1981, the federal defendants, who had not yet answered or otherwise responded to the amended complaint, notified the court that there would be no further need for the court to consider plaintiffs' application for preliminary injunctive relief. The letter also indicated that the expiration dates of the permits had been advanced to September 1. Thereafter, plaintiffs withdrew their application and the parties entered into settlement negotiations.

On March 26, 1982, a stipulation of settlement was filed, pursuant to which the court entered an order dismissing the action without prejudice on March 29, 1982. In the stipulation, defendants agreed that no chemical pesticides would be applied to the Seatuck or Wertheim National Wildlife refuges "unless or until the federal defendants (1) have determined that the application of B.T.I. [a bacterial control substance] is not an environmentally safe and feasible alternative to the proposed application of the chemical pesticides, and (2) have complied with the requirements of the National Environmental Policy Act and the National Wildlife Refuge System Administration Act . . ." Stipulation of Settlement at 3. In addition, defendants acknowledged that the limitations set forth in the Final Recommendations "are applicable to and shall

govern the application, pursuant to permit or otherwise, of chemical pesticides to the Seatuck and Wertheim National Wildlife Refuges." *Id.* Finally, defendants agreed that the foregoing limitations would not be rescinded or modified unless the Fish and Wildlife Service complied with applicable laws and regulations and provided public notice, and actual notice to the plaintiffs, not less than 30 days before the effective date of any proposed rescission or modification.

Based on the foregoing facts, the federal defendants oppose the instant application for an award of attorneys' fees and costs under the Equal Access to Justice Act (EAJA or the Act) on three grounds. Defendants maintain (1) that plaintiffs are not "prevailing parties" within the meaning of the Act; (2) that even if the plaintiffs did prevail, they are not entitled to fees under the Act because the position of the government was "substantially justified;" and, (3) that any award to which the plaintiffs are otherwise entitled should be limited to those services performed on or after October 1, 1981, the effective date of the Act.[2] These arguments will be addressed *seriatim.*

*Plaintiffs as Prevailing Parties Under the EAJA.*

The threshold issue is whether the plaintiffs are properly viewed as prevailing parties within the meaning of the Act. This determination is important both with respect to the plaintiffs' application for costs, under subsection (a) of the Act,[3] and with respect to their application for attorneys' fees and expenses, under subsection (d)(1)(A).[4]

---

**2.** It is uncontroverted that plaintiffs meet the financial eligibility requirements of the Act. *See* 28 U.S.C. § 2412(d)(2)(B).

**3.** 28 U.S.C. § 2412(a) provides:
except as otherwise specifically provided by statute, a judgment for costs, as enumerated in Section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of

such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

**4.** 28 U.S.C. § 2412(d)(1)(A) provides:
except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than

The legislative history of the Act clearly indicates that a party need not win a final judgment following a trial on the merits in order to qualify as a "prevailing party." Thus, a litigant who obtains a beneficial settlement may be deemed a "prevailing party," regardless of whether that party ultimately prevailed on all issues. H.R. Rep. No. 96–1418, 96th Cong., 2d Sess. 11, *reprinted in* [1980] U.S.Code Cong. and Ad. News 4953, 4990 (House Report). This usage is consistent with the law that has developed under other federal fee-shifting statutes, *see generally Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980) (Civil Rights Attorneys' Fees Award Act of 1976); *Hanrahan v. Hampton,* 446 U.S. 754, 756–57, 100 S.Ct. 1987, 1988, 64 L.Ed.2d 670 (1980) (per curiam) (same); *Foster v. Boorstein,* 561 F.2d 340 (D.C.Cir.1970) (Title VII of the Civil Rights Act of 1964), and has been accepted by other courts that have confronted the issue in the context of the EAJA. *See, e.g., Citizens Coalition v. Euclid,* 537 F.Supp. 422, 424–25 (N.D.Ohio 1982); *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 350 (D.D.C. 1982). It therefore becomes necessary for the court to compare the plaintiffs' original request(s) for relief with the stipulation of settlement, in order to determine whether the terms of the latter are sufficiently favorable for the plaintiffs to qualify as a prevailing party. Plaintiffs bear the burden of proof on this issue. *Citizens Coalition v. Euclid, supra,* 537 F.Supp. at 424.

In the complaint and the amended complaint plaintiffs ultimately sought to establish that the federal defendants were obligated to follow certain administrative procedures before they could lawfully authorize the application of insecticides to the Seatuck and Wertheim refuges. In the stipulation of settlement, the federal defendants admit as much. Nevertheless, defendants argue, because the settlement "merely require(s) that the federal defendants obey the law," Defendants' Brief at 8, the plaintiffs cannot properly be considered prevailing parties. This argument is not persuasive.

Contrary to the defendants' contention that their obligation to obey the law was "self-evident long before the ... settlement was drafted," Defendants' Brief at 8, the record reveals that before this action was initiated, federal defendants made no attempt to "obey the law."[5] For example, defendants acknowledged in the settlement agreement, and again in their brief, that NEPA requires defendants to consider various alternatives, including the biological control agent B.T.I., before authorizing the use of chemical pesticides. In this case, however, it is uncontroverted that defendants never considered any alternative measures prior to issuing the Seatuck and Wertheim permits.

Furthermore, the settlement agreement also obliges the federal defendants to follow the guidelines set forth in the Final Recommendations, at least until those guidelines are lawfully changed. The significance of

cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

Subsection (d)(2)(A) makes clear that "fees and other expenses" includes reasonable attorneys' fees.

5. The record in this case consists of the response of defendant Ray G. Arnett to the plaintiffs' Freedom of Information Act request for "all memoranda or other documents which pertain to use of pesticides [on] Interior Department lands on Long Island, New York, during the summer of 1981." The documents produced in response to this request were submitted

as exhibits to the complaint filed in this action. While these documents hardly comprise a fully developed factual record, both parties indicated in papers submitted to the court that they did not believe that it was either necessary or appropriate for the court to conduct an evidentiary hearing to supplement the record for purposes of this motion. Letter of Assistant United States Attorney Ben Wiles, August 2, 1982; Letter of Edward Lee Rogers, August 5, 1982. Under these circumstances, the court has relied solely on the materials before it in reaching its decision. *Cf. Iranian Students Ass'n v. Sawyer,* 639 F.2d 1160 (5th Cir.1981) (court erred in not granting hearing on motion for attorneys' fees where one was requested).

this aspect of the settlement should not be discounted. As far as the court has been able to determine, the Final Recommendation—which the present Administration inherited from its predecessor—have never been codified in the permanent regulations of the Fish and Wildlife Service, nor has notice of their adoption ever been published in Federal Register. Thus, from the plaintiffs' standpoint, one beneficial aspect of the settlement reached in this lawsuit has been to clarify the uncertain status of the policies in the Final Recommendation, which had previously been disregarded.

■ It is clear to the court, then, that the plaintiffs did prevail in this action. This conclusion is not affected by the fact that the plaintiffs did not formally receive the specific relief requested in their complaint(s), *see generally Iranian Students Ass'n v. Sawyer,* 639 F.2d 1160, 1163 (5th Cir.1981), nor by the fact that the defendants never expressly admitted any wrongdoing in the settlement. *Robinson v. Kimbrough,* 620 F.2d 468, 476 n. 8 (5th Cir.1980). Where, as here, the plaintiffs have established that the basic objectives that they sought from the lawsuit have been achieved, or at least furthered in some significant way, they have made a sufficient showing to justify an award of attorneys' fees under the EAJA. *Cf. Coyote v. Roberts,* 502 F.Supp. 1342, 1346 (D.R.I.1980) (partial relief sufficient to support award of fees under Civil Rights Attorneys' Fees Award Act of 1976).[6]

*Substantial Justification.*

Under the EAJA, a prevailing party is entitled to attorneys' fees "unless the position of the United States was substantially justified," 28 U.S.C. § 2412(d)(1)(A), and it is well settled that the government has the burden of proof on this issue. *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 351 (D.D.C. 1982); *Alspach v. District Director,* 527 F.Supp. 225, 228 (D.Md.1981). However,

because the legislative history is somewhat ambiguous, *see generally Operating Engineers v. Bohn,* 541 F.Supp. 486, 493–96 (D.Utah 1982), there has been some disagreement as to precisely how to interpret the phrase "position of the United States." Some courts have focused solely on the litigation stance adopted by the government. *E.g., Alspach v. District Director, supra; Operating Engineers v. Bohn, supra; S & H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Comm.,* 672 F.2d 426 (5th Cir.1982). Other courts, in contrast, have broadened the scope of the inquiry to include both the government's litigation position and the underlying activity which precipitated the lawsuit. *E.g., Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348 (D.D.C.1982); *Fitzgerald v. Hampton,* 545 F.Supp. 53 (D.D.C.1982). *See also Wolverton v. Schweiker,* 533 F.Supp. 420 (D.Idaho 1982). Of course, these two viewpoints are not entirely inconsistent. For example, in cases defended by the government, any evaluation of the government's litigation position will necessarily include some consideration of the primary governmental activity giving rise to suit. On the other hand, in enforcement actions brought by the government, the government's litigation position will in effect be the primary activity in question. Therefore, the distinction between these two approaches will often be academic. However, in a situation such as the case at bar, where the government settled the case shortly after it was initiated, the difference may prove to be critical.

■ After having reviewed the available authorities, the court concludes that the preferable approach is to consider both factors, the government's underlying activity and its litigation position. Neither the language nor the legislative history of the EAJA indicates that Congress intended the courts to distinguish between the govern-

---

**6.** The court's conclusion that the plaintiffs were the prevailing party in this action is in no way based on the fact that the permits involved were revoked shortly after the action was commenced and shortly before a hearing was to be held on plaintiffs' application for a preliminary injunction. There is insufficient evidence before the court to determine whether the commencement of the action and the revocation of the permits were causally related.

ment's primary activity and its litigation stance in determining whether its "position" was substantially justified. If anything, the "conflicting" references in the legislative history to both of these factors suggest that both should be taken into account. *Compare* House Report at 4989–90 with House Report at 4997. *See also* H.R.Rep. No. 1434, 96th Cong. 2d Sess. 21, *reprinted in* [1980] U.S.Code Cong. & Ad. News 5011.

This approach is also more in accord with the remedial purposes of the EAJA, which was primarily designed to reduce the economic deterrents that often preclude private parties from seeking review of or defending against unreasonable governmental action. If the government's litigation position was the sole consideration, then the government could insulate itself from any liability for attorneys' fees, no matter how unreasonable the action challenged, simply by conceding error or settling on reasonable terms after a suit has been filed. In this manner, one of the principal purposes of the EAJA could easily be frustrated.

The case at bar aptly illustrates this point. Because of the abbreviated procedural history of this case, the litigation position adopted by the government has been limited to its opposition to plaintiffs' request for the temporary restraining order and its willingness to settle the case once the permits expired. If the court were confined to considering only these aspects of the case, it would be compelled to conclude that the government's position was substantially justified.[7]

■ At the same time, the factual record in this case shows that prior to suit the government made no attempt whatsoever

to comply with the legal requirements that the stipulation of settlement now establishes are applicable to the spraying of chemical pesticides on the Seatuck and Wertheim refuges. This wide disparity between the government's original position and the terms of the settlement supports plaintiffs' contention that the underlying governmental activity at issue in this case was not substantially justified. In view of the policy considerations already outlined, the court therefore concludes that, on balance, the position of the government was not substantially justified. As a result, plaintiffs are entitled to recover attorneys' fees and expenses under the Act.

*Attorneys' Fees Incurred Prior to October 1, 1981.*

The EAJA took effect on October 1, 1981, and is applicable to "any civil action ... which is pending on, or commenced on or after such date." 28 U.S.C. § 2412 (note). Although the federal defendants concede that this action was pending on October 1, 1981, they nevertheless argue that plaintiffs may not recover for any legal services performed prior to the effective date. Defendants base this argument on the well-established principle that any waiver of sovereign immunity by the federal government must be express. *See generally Alyeska v. Wilderness Society,* 421 U.S. 240, 267–68, 95 S.Ct. 1612, 1626, 44 L.Ed.2d 141 (1975).

■ The government's argument is based on a strained interpretation of the EAJA and must be rejected. On its face the Act waives sovereign immunity for attorneys fees in any case "pending" on or after October 1, 1981, and nothing in the legislative

---

**7.** *Cf. Citizens Coalition v. Euclid,* 537 F.Supp. 422, 426 (N.D.Ohio 1982). In *Citizens Coalition,* the court noted that when there has been no trial and no admission of fault by the government in a consent decree or otherwise, a court faced with an application for fees under the EAJA should focus on the government's litigation position. However, the *Citizens Coalition* rationale—that under these circumstances, a court would generally have insufficient information to determine the reasonableness of the underlying activity—does not apply with

much force to the case at bar, where the facts alleged by the plaintiffs were not controverted by the government.

Moreover, parties rarely if ever admit fault in a consent decree, *see Robinson v. Kimbrough, supra,* 620 F.2d at 476 n. 8, and the *Citizens Coalition* rationale would therefore preclude a court from examining the underlying governmental activity in any case which was terminated prior to trial. As has already been seen, this would tend to undermine the remedial purposes of the EAJA.

history indicates otherwise. The court cannot alter the plain meaning of the statute. Nor surprisingly, this interpretation has been accepted by virtually every court that has confronted this issue, *e.g., Photo Data, Inc. v. Sawyer, supra; Wolverton v. Schweiker,* 533 F.Supp. 420 (D.Idaho 1982); and has been implicitly accepted by many others. *E.g., Heydt v. Citizens State Bank,* 668 F.2d 444 (8th Cir.1982); *Muth v. March,* 525 F.Supp. 604, 609 (D.D.C.1981). The court is aware of only one decision where the argument advanced by the government in this case has been adopted. *See Allen v. United States,* No. 79 Civ. 381 (N.D.Ill. July 6, 1982). To the extent that the *Allen* court relied on *Brookfield Construction Company v. United States,* 661 F.2d 159 (Ct.Cl.1981), a case involving the Contract Disputes Act of 1978, 41 U.S.C. § 611, in reaching its decision, this court respectfully disagrees with its reasoning.

*The Reasonableness of the Fees and Expenses Requested.*

■ Plaintiffs' attorneys have submitted detailed affidavits documenting the precise hours spent and funds expended in connection with this litigation. Plaintiffs' briefs also contain several appendices which purport to compute the appropriate "lodestar" figures for each attorney and student intern who was involved with the case. *See generally Copeland v. Marshall,* 641 F.2d 880, 891 (1980). The hourly rates requested for each individual appear to be based on prevailing market rates and are at or within the 75 dollar-per-hour limit established by 28 U.S.C. § 2412(d)(2)(A). In the absence of any objection by the defendants to hours and amounts the court finds that both the attorneys' fees and related litigation expenses requested by the plaintiffs are reasonable.

*Conclusion.*

For the foregoing reasons, the plaintiffs' application for attorneys' fees and expenses and costs is granted. The clerk is directed to tax costs including $24,398.27 in attorneys' fees and enter judgment accordingly.

SO ORDERED.