**TRIDENT MARINE CONSTRUCTION, INC., Plaintiff,**

v.

**DISTRICT ENGINEER, the UNITED STATES ARMY CORPS OF ENGINEERS, DETROIT DISTRICT; Col. Raymond Beurket, Jr., Contracting Officer; Richard Durkin, Regional Administrator; United States Small Business Administration, Chicago Region, Defendants.**

**No. K83–478.**

United States District Court, W.D. Michigan, S.D.

May 29, 1984.

Mark Verwys, Todd R. Dickinson of Tolley, Fisher & Verwys, P.C., Grand Rapids, Mich., for plaintiff.

John A. Smietanka, U.S. Atty., Carol Husum, Asst. U.S. Atty., Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

Presently before the Court is Plaintiff's Application for Taxation of Costs, Fees and Other Expenses pursuant to § 204(a) of the Equal Access to Justice Act. 28 U.S.C. § 2412. Plaintiff seeks reimbursement from the United States for attorney's fees and other litigation costs incurred during the period from September 21, 1983, through November 7, 1983, in connection with its Complaint for injunctive and declaratory relief and this application.

### A. Applicable Facts

This litigation arose out of the awarding of a contract by the United States Army Corps of Engineers (Corps) to Zenith Dredging Company (Zenith) for the repair of the south breakwater extending from the Muskegon Harbor into Lake Michigan. During the summer of 1983, it was decided

that the bidding on this contract would be limited to small businesses as defined in the Small Business Act, 15 U.S.C. § 632, and applicable regulations. 13 CFR §§ 121.3, *et seq.* Canonie Construction Company (Canonie) formally protested the setting aside of this contract for small businesses, thereby causing the bid opening to be delayed from August 9, 1983, until August 23, 1983. The bid opening was finally carried out subject to Canonie's protest. Upon learning that Trident Marine Construction, Inc. (Plaintiff) was the low bidder, Canonie withdrew its protest. This naturally aroused suspicions among members of the Corps' contracting staff that Plaintiff was affiliated with Canonie and thus ineligible to receive the contract.[1] The Corps initiated its own protest on or about August 30, 1983, regarding Plaintiff's qualification as a small business. On that same date, the Corps received a brief letter from Zenith, the second low bidder, requesting the contract award be suspended until Plaintiff's eligibility as a small business was verified. The Corps forwarded both protests to the regional office for the Small Business Administration (SBA) in Chicago, Illinois, since that agency is vested with the authority to make such determinations.

On September 1, 1983, the SBA notified Plaintiff of Zenith's protests by a letter in which was enclosed an SBA Form 355 (Application for Small Business Size Determi-

nation).[2] Plaintiff was required to complete this form and return it to the SBA within three working days of the receipt of the letter which had been sent via certified mail to Plaintiff's post office box in South Haven, Michigan. According to the custom of the SBA's regional office in Chicago, the commencement of the three-day deadline was tolled until the date upon which the letter was noted on the certified mail receipt as being received by the protested firm. For some unknown reason, the SBA's letter alluded only to the protest filed by Zenith, and not the Corps.

The evidence showed that the SBA letter had been mailed promptly and received at the South Haven Post Office on September 3, 1983. It languished there until September 14, 1983, when James Collins, Plaintiff's President, retrieved it after being notified by individuals both from the Corps and the SBA that they were awaiting his response. During the period from September 14, 1983, to September 19, 1983, Collins went about accumulating the financial information necessary to respond to Zenith's protest, a task made more difficult by his business schedule which demanded his presence in Missouri and Oregon. On September 19, 1983, the last day for responding to Zenith's protest, Collins telephoned William Kokal, a subcontracting specialist with the SBA's Chicago office, to inform him that Plaintiff's response was being sent from Oregon via Federal Express.

1. In 13 CFR § 121.3–2(a)(vi), the SBA has set forth the following factors as being indicative of an affiliation between two firms:

*Control through common management.* A concern should be considered as controlling or having the power to control another concern when one or more of the following circumstances are found to exist, and it is reasonable to conclude that under the circumstances, such concern is directing or influencing or has the power to direct or influence, the operation of such other concern.

(A) *Interlocking management.* Officers, directors, employees, or principal stockholders of one concern serve as a working majority of the board of directors or officers of another concern.

(B) *Common facilities.* One concern shares common office space and/or employees and/or other facilities with another concern

particularly where such concerns are in the same or related industry or field of operation, or where such concerns were formerly affiliated.

(C) *Newly organized concern.* Former officers, directors, principal stockholders, and/or key employees of one concern organize a new concern in the same or a related industry or field of operation, and serve as its officers, directors, principal stockholders, and/or key employees, and one concern is furnishing or will furnish the other concern with subcontracts, financial or technical assistance, and/or other facilities, whether for a fee or otherwise.

2. An SBA Form 355 requires a company to disclose certain financial information, particularly any affiliations it has with other companies.

Despite Collins' belief to the contrary, Kokal did not grant Plaintiff an extension beyond September 19, 1983, to file the response. Shortly after this conversation but prior to the close of business, Col. Raymond Beurkett ", the District Engineer for the Corps' Detroit District and contracting officer for the project," called Kokal to verify his staff's belief that the SBA had disqualified Plaintiff from receiving the contract. Kokal informed Col. Beurkett that Plaintiff had been declared ineligible due to its failure to respond to Zenith's protest in a timely manner. After learning from the Corps that Zenith had been awarded the contract, Collins—understandably chagrined by the whole affair—called Kokal and belatedly requested that the SBA extend the period for Plaintiff to respond. The following day, Plaintiff's officers met with SBA officials in an unsuccessful attempt to persuade them to rescind the contract award.

After exhausting all informal means for redress, Plaintiff filed a complaint for injunctive and declaratory relief with this Court. At the conclusion of a three-day hearing, I held that Zenith's letter was legally insufficient to constitute a protest under applicable SBA regulations.[3] I further held that the Corps was estopped from awarding a contract earlier than the close of business on September 19, 1983, since it had agreed to withhold action pending the SBA's size determination.[4] Finally, I directed that the contract be awarded to Plaintiff after learning, on the final day of the hearing, that the Corps had decided to void the project unless the contract was committed to some company by September 30, 1983.

### B. Equal Access to Justice Act

■ Under the so-called "American rule" regarding the allocation of costs of counsel,

3. 13 CFR § 121.3–5 provides in pertinent part:
A protest must adequately set forth specific alleged grounds for the protest. A protest merely alleging that the protested concern is not small or is affiliated with unspecified other concerns will not be deemed to adequately specify grounds for the protest. Evidence supporting the protest may be submitted therewith. Protests which do not set forth specific alleged grounds for the protest will be dismissed.
Attention: Mrs. Wanda Carter Davis
   Procurement & Supply Division
Subject: Protest
   South Breakwater Repairs
   Muskegon Harbor, Michigan
   DACW 35–83–B–0034
We protest the bid of Trident Marine Inc. We further request that award be delayed until their qualifications as small business, affiliation with Canonie, and experience records are verified.
   Very truly yours,
   ZENITH DREDGE COMPANY
   Mr. Keith Yetter
   Vice President

4. 32 CFR 1–703(d)(3)(i) and (iv) provides in pertinent part:
The SBA District Director will determine the small business status of the questioned bidder or offeror and notify the contracting officer and the bidder or offeror of his determination and award (sic) may be made on the basis of that determination. This determination is final unless it is appealed in accordance with (4) below, and the contracting officer is noti-

fied of the appeal prior to the award. If an award was made prior to the time the contracting officer received notice of the appeal, the contract shall be presumed to be valid. Action to be taken on SBA determinations shall be as follows:
(i) If the SBA District Director's determination is not received by the contracting officer 10 working days after SBA's initial receipt of a protest or notice questioning the Small Business status of a bidder or offeror, it shall be presumed that the questioned bidder or offeror is a small business concern. This presumption will not be used as a basis for making an award to the questioned bidder or offeror without first ascertaining when a size determination can be expected from SBA, and where practicable, waiting for such determination, unless further delay in award would be disadvantageous to the Government.
(iv) Until receipt of the SBA determination of the size status, or expiration of the ten day period (30 days in ... case of an appeal to the Chairman, Size Appeals Board), whichever occurs first, contracting action shall be suspended; however, this suspension shall not apply to any urgent acquisition action which the contracting officer determines in writing must be awarded without delay to protect the public interest. The contracting officer's determination shall be placed in the contract file.
Had the Corps not deferred to the SBA's investigation, then it apparently had the power to award the contract to Plaintiff despite Zenith's protest.

prevailing litigants are not entitled to collect attorney's fees from the losing party except when the losing party has acted in bad faith or the winning litigant has bestowed a benefit upon a class of persons. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In 1980, Congress enacted the Equal Access to Justice Act ("the Act"), *supra*, whereby private parties may recover attorney's fees from the Government under certain circumstances. § 2412(b) of the Act codifies the American Rule and its exceptions by making the Government liable for fees and expenses to the same extent that a private party would be liable under the common law. The major change is found in § 2412(d)(1)(A) which provides that the Court shall award eligible, prevailing, private parties attorney's fees and expenses except where the "court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." Plaintiff argues that it is entitled to fees and costs only under this provision of the Act.

■ As a threshold matter, Plaintiff must first qualify as a small business under the Act, 28 U.S.C. § 2412(d)(2)(B), and the "prevailing party" in this lawsuit. 28 U.S.C. § 2412(a) and (b). In its application, Plaintiff asserts that it meets these requirements by employing less than 500 persons and having a net worth of less than $5 million. The Government does not dispute either of these contentions. Further, I find that Plaintiff is clearly the prevailing party in that it obtained virtually all of the relief sought in its Complaint.

■ Plaintiff must next show that the Government's "position" was not substantially justified. 28 U.S.C. § 2412(d)(1)(A). Some courts have interpreted this phrase to refer to the Government action which gave

rise to the lawsuit. This approach focuses on whether the Government's action had a legal justification. *See, Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 703 F.2d 700 (CA 3 1983); *Nunes-Correia v. Haig*, 543 F.Supp. 812 (D. DC 1982); *Photo-Data, Inc. v. Sawyer*, 533 F.Supp. 348 (D. DC 1982); *Wolverton v. Schweiker*, 533 F.Supp. 420 (D.Idaho 1982); *Environmental Defense Fund v. Watt*, 554 F.Supp. 36 (E.D.N.Y.1982) *aff'd*, 722 F.2d 1081 (1983). Alternatively, the term has been interpreted to refer to the stance which the Government assumed during litigation. *Broad Avenue Laundry & Tailoring v. United States*, 693 F.2d 1387 (C.A.Fed.1982); *Tyler Business Services Inc. v. NLRB*, 695 F.2d 73 (CA 4 1982); *Spencer v. NLRB*, 712 F.2d 539 (C.A.D.C.1982), *petition for cert. denied*, — U.S. —, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1983); *United States v. 2,116 Boxes of Boned Beef*, 726 F.2d 1481 (CA 10 1984). These two interpretations are known respectively as the "underlying action" and "litigation position" theories.

The legislative history of the Act has been interpreted as supportive of the "underlying action" theory, *Natural Resources Defense Council v. U.S. Environmental Protection Agency, supra,* or simply inconclusive on the issue. *Spencer v. NLRB, supra.* Apart from the ambiguity of Congress' intentions, both theories involve serious shortcomings in application. Taken to its logical conclusion, the litigation position theory justifies any improper agency action for purposes of the Act so long as the Government lawyers behave themselves once litigation is instituted. Such an approach arguably violates the purpose of the Act which, according to its preamble, is to enable individuals and organizations to challenge improper governmental action without fear of incurring large litigation expenses.[5] The Act recog-

---

5. The preamble to the Act states:
(a) The Congress finds that certain individuals, partnerships, corporations, and labor and other organizations may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights in civil actions and in administrative proceedings.
(b) The Congress further finds that because of the greater resources and expertise of the United States the standard for an award of

nizes the imbalance of resources available to parties challenging the Government in most instances. The litigation position theory does, to some degree, undermine these policies by enabling the Government to avoid paying fees and costs by behaving responsibly in lawsuits. This takes the sting out of the Act in that the Government need not fear resort to litigation, a result that certainly imposes substantial burdens upon the aggrieved party both in terms of time and money. However, as noted in *Spencer v. NLRB, supra,* Congress did not intend to create a system which automatically shifts fees and costs to the Government whenever it is the losing party in a lawsuit. Not only does this impose an excessive financial burden upon the Government, it also inhibits the executive branch's law enforcement efforts.

As a practical matter, it will often make no difference how a court conceives of the Government's "position" in most cases. In the ordinary case, the Government's litigation position will be that the action which precipitated the case was justified. *See, Environmental Defense Fund v. Watt, supra,* at 40; *Citizens Coalition for Block Grant Compliance v. City of Euclid,* 537 F.Supp. 422 (N.D.Ohio 1982) *aff'd,* 717 F.2d 964 (CA 6 1983). In the instant case, I reviewed the actions of the Corps and the SBA under the arbitrary and capricious standard set out in the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).[6] Since the Plaintiff succeeded in having the contract set aside, it would fly in the face of logic now to say that the underlying actions of the Corps and SBA were substantially justified. Nevertheless, the litigation position theory does not mandate automatic

awards of attorney's fees to the prevailing party. To award fees and costs whenever the Government loses ignores those instances in which the Government can legitimately argue that the agency's action was reasonable or improper, but something less than arbitrary and capricious. It would be contrary to the policy of the Act to penalize the Government for asserting a litigable, albeit unpersuasive, position in a lawsuit. While the legislative history is not altogether clear on which position Congress intended to adopt, I find that, on balance, the litigation position theory better accommodates the competing policies of the Act.

■ The second phrase of § 2412(d)(1)(A) central to cases arising under the Act is the term "substantially justified". The Government must show that its position, as now defined, is substantially justified in order to avoid being penalized for fees and costs. With respect to this standard, the House Report states:

> The test of whether or not a Government action is substantially justified is essentially one of reasonableness. Where the Government can show that its case had a reasonable basis both in law and in fact, no award will be made....
>
> The standard, however, should not be read to raise presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing. H.R.Rep. No. 1418, 96th Cong., 2d Sess., 10–11 (1980) (U.S.Code Cong. & Admin. News, 1980, 4989–4990).

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....

---

fees against the United States should be different from the standard governing an award against a private litigant in certain situations. (c) It is the purpose of this title—
　(1) to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States.... Pub.L. No. 96–481 § 202, 94 Stat. 2321, 2325 (1980).

**6.** 5 U.S.C. § 706(2)(A) provides:

The Senate Committee on the Judiciary refused to adopt an amendment which would have changed the Act's language from "substantially justified" to "reasonably justified"; therefore, the standard must be refined to one that requires the Government's position to be somewhat more than reasonable. S.Rep. No. 96–253, 96th Cong., 1st Sess. 1, 6 (1979). *See also, Spencer v. NLRB, supra; Berman v. Schweiker,* 531 F.Supp. 1149 (N.D.Ill.1982) *aff'd,* 713 F.2d 1290 (CA 7 1983); *Hornal v. Schweiker,* 551 F.Supp. 612 (M.D.Tenn. 1982). In close cases, the *Spencer* court has noted that a court should consider the clarity of the governing law, complexity and length of the litigation and consistency of the Government's position toward private litigants in similar positions, in determining whether the Government reasonably pursued its position. *Spencer v. NLRB, supra,* at 559–561.

## C. The Government's Litigation Position

■ During the hearing the Government proposed a number of different theories justifying the awarding of a contract to Zenith. In its brief, it expounded in great, perhaps excessive, detail upon its interpretation of the facts and law in this case. When all of this is sorted out, it appears that the Government disagrees with the Court's ruling in nearly every respect. Although its arguments were ultimately unpersuasive, I find that the Government nevertheless had a litigable position in this case.

The Government takes issue with the legal insufficiency of Zenith's protest. Its argument is premised on the judicial doctrine that courts are to pay some deference to an agency's interpretation of the statute and regulations which it implements. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Contracting specialists from the Corps and SBA considered Zenith's letter of August 30, 1983, an acceptable protest. The Government argues that it would be unreasonable to expect the protesting company to file a lengthy protest given the brief period of time following bid opening to do so and a small firm's lack of resources to investigate its competitor's affiliations. This argument ignores the express wording of the regulation (13 CFR § 121.3–5) and its obvious goal of furthering the public interest in a prompt procurement process unhindered by off-the-cuff protests. *See, e.g., Foley Construction Co. v. U.S. Army Corps of Engineers,* 716 F.2d 1202 (CA 8 1983) *petition for cert. denied,* —— U.S. ——, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1983); *Allis-Chalmers Corp., Hydro-Turbine Division v. Friedkin,* 635 F.2d 248 (CA 3 1980). Nevertheless, it is a legitimate argument with some persuasive effect.

The Government also argues that the Corps' awarding of the contract to Zenith on September 19, 1983, was justified and even if improper it was not an arbitrary and capricious action. The Government correctly points out that Kokal never granted Plaintiff an extension in which to file its response during his conversation with James Collins on September 19, 1983. Since its response did not arrive before 5 o'clock p.m. on that day, Plaintiff cannot now argue that it met this deadline. The Government concedes that Col. Beurkett acted improperly in awarding the contract before the close of business on September 19, 1983. However, it argues that this was not arbitrary or capricious since Plaintiff was largely responsible for the rush to award the contract that day. The Government interprets the Plaintiff's dilatoriness in responding as an effort to buy time in order to purge itself of any appearance of affiliation with Canonie or alternatively, to place the Corps in a position of having to award the contract to Plaintiff in order to retain the monies for the Muskegon project. In support of this theory, the Government points out that Plaintiff's officers—Collins and Neal—had past experience with Government contracting and that Neal knew as early as August 29, 1983, about the Corps' suspicions of its affiliation with Canonie. Although there was insufficient evidence to ascribe these ulterior motives to Plaintiff, I did state in my Bench Opinion that the Corps had legitimate res-

ervations, apart from Zenith's protest, about Plaintiff's affiliation. Given this evidence, the Government was justified in arguing bad faith on the part of Plaintiff.

The factual complexity of the case was compounded by a maze of not entirely consistent regulations against which the Corps' and SBA's conduct had to be judged. The armed forces regulations, 32 CFR § 1–703(d)(3)(i) and (iv), could be interpreted as authorizing the awarding of the contract to Zenith. Moreover, the parties had little, if any, case precedent in determining how the regulations dealing with armed forces procurement and the SBA's operations should be read in conjunction and applied in this case. In light of this ambiguity, Government's counsel clearly would have been shirking her duty by not opposing Plaintiff's Complaint.

This case is also unusual in that the relief which seemed, in retrospect, appropriate until the last day of the hearing was significantly different than that finally accorded to Plaintiff. Until the final day, it would have seemed proper to hold the contract award in abeyance pending a size determination by the SBA's Size Appeals Board. However, when it was learned that if the contract were not awarded by September 30, 1983, the funds for the Muskegon project would be rerouted elsewhere in the United States, the Court was then placed in the unenviable position of having to award the contract to Zenith or Plaintiff without allowing the normal administrative procedures to be exhausted. Prior to that point, the goal of the Government's litigation position was to preclude Plaintiff from having the opportunity to verify its small business status before the SBA. On the last day of the hearing, some doubt was raised by Alan Shapiro, the Corps' district counsel for the Detroit district, as to whether the Court had the jurisdiction to re-award the contract to Plaintiff. The Government legitimately believed, and so argued, that the award to Zenith had to be upheld at the risk of losing the funding for the project. Although I disagreed with this position and ultimately awarded the contract to Plaintiff, I cannot say that its position was unreasonable.

Subsequent to the hearing, the Government's counsel learned for the first time that Zenith had withdrawn its protest on September 15, 1983. No explanation is given for the Corps' failure to disclose this information during the hearing; however, it appears that none of the Corps' representatives who attended or participated in the hearing were aware of this fact. Not surprisingly, Plaintiff argues that this is reason enough to award fees and expenses since Zenith's withdrawal obviated the need for the motion and hearing. That fact would be critical if I had adopted the underlying action theory. However, the litigation decision theory limits my scope of review to the reasonableness of the Government's legal theories in light of the facts known to the Government's counsel at the time of the hearing. Absent any showing that the Government's counsel or representatives withheld this fact from the Court prior to the entry of the final order, this information is irrelevant to the resolution of this application.

Accordingly, an order will be entered denying Plaintiff's application for attorney fees pursuant to 28 U.S.C. § 2412(b).

Plaintiff also requests it be awarded costs and expenses pursuant to 28 U.S.C. § 2412(a). However, the Court will take that request under advisement pending the resolution of some ambiguities in the Plaintiff's bill of costs. An order will be issued forthwith outlining those ambiguities and asking Plaintiff to clarify the same.