**U.S.A., Plaintiff,**

v.

**LAKESHORE TERMINAL AND PIPELINE CO., Defendant.**

**Civ. A. No. 78–10135 BC.**

United States District Court, E.D. Michigan, S.D.

June 12, 1986.

Donald T. Bucklin, Squire, Sanders & Dempsey, Washington, D.C., Richard G. Smith, Bay City, Mich., for defendant.

Michael Hluchaniuk, Asst. U.S. Atty., Bay City, Mich., Richard W. Oehler, Commercial Litigation Branch, Washington, D.C., for plaintiff.

### MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

This case is now before the Court on defendant's motion for an award of attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d). The defendant

seeks an award of attorney fees in the amount of $260,298.00.

In 1979, the United States filed this declaratory judgment action seeking a ruling that it was entitled to purchase the Harrisville petroleum storage and terminalling facilities owned by the defendant Lakeshore. The Harrisville facility is located in northern Michigan and services Wurtsmith Air Force Base. In an opinion dated December 21, 1982, this Court adopted a magistrate's recommendation which granted summary judgment in favor of the defendant. The United States appealed that ruling to the Court of Appeals for the Sixth Circuit but eventually dismissed the appeal when it decided that it no longer sought ownership of the Harrisville facilities. The defendant now seeks an award of attorney fees.

### Factual Background

In 1956, Congress sought to increase national security by facilitating the construction of petroleum storage and terminalling facilities in rural areas that were less vulnerable to attack.[1] Accordingly, Congress authorized the Secretary of Defense to contract for the storage and handling of petroleum. *See* 10 U.S.C. § 2388.

Recognizing the commercial impracticality of locating petroleum storage facilities in rural areas, the United States provided the incentives necessary to induce private construction of such facilities by entering into long term contracts. These contracts called for heavily front loaded payments which allowed contractors to recapture their construction costs quickly. Part and parcel to this program was a Congressional intent that the United States be allowed to purchase these petroleum storage facilities after they had been constructed. Congress also intended that the government be allowed at least a partial credit against the purchase price for the front loaded payments.[2]

1. *Military Public Works Bills: Hearings on H.R. 8625 and 9893 Before the House Comm. on Armed Services,* 84th Cong., 2d Sess., 6808 (1956).

2. *Military Public Works Construction Bill: Hearings on S.3122 Before the Subcomm. on Real*

*Estate and Military Construction of the Senate Armed Services Committee,* 84th Cong., 2d Sess. 792 (1956).

In April 1961, the United States entered into a contract with American Fuel Company, the defendant's predecessor in interest. That contract required American Fuel to provide petroleum storage and terminalling facilities to service Wurthsmith Air Force Base. Under the contract, the government had an option to renew the three-year contract for 15 successive three-year periods, upon the same terms and conditions. Section XIII of the contract also gave the government the option to purchase the completed petroleum facilities. Section XIII provides:

> At any time during the period of this contract or any renewal thereof, Government shall [sic] the option to purchase the petroleum storage and terminalling facilities furnished under this contract, including underlying land, and any Contractor furnished pipeline, on the following terms and conditions.

The contract then set forth two alternate purchase price formulas. The section relevant to this case provided:

> If purchase is made subsequent to "Acceptance Date" of the facility as such term is defined in Section IV and prior to the expiration date of this contract, the purchase price will be the total actual incurred costs of completing the facility less that amount of revenue received under this contract which is reasonably allocable to amortization of facility costs.

During the first three years of the life of this contract, the United States paid American Fuel $1,412,000.00. In the following five years, the United States paid American Fuel an additional $1,929,400.00. These payments were intended to reimburse American Fuel's construction costs and cover operating expenses.

In 1967, Lakeshore purchased the Harrisville facilities from American Fuel Company. Because American Fuel did not own the land on which the Harrisville facility was located, Lakeshore also purchased the land but from another party. Lakeshore paid $95,000.00 for both the petroleum storage facilities and the land and assumed all of the contractual rights and responsibilities of American Fuel Company.

In 1977, the United States notified Lakeshore that it intended to exercise its option to purchase the Harrisville facilities. Believing that it had fully compensated American Fuel and Lakeshore for the construction costs of this facility, the United States felt that it was entitled to have the facility transferred to it for zero dollars. Lakeshore responded, through its parent company—the Detroit and Mackinac Railway Company, that it disagreed with the government's assessment. Lakeshore notified the government that it valued the property at $6,000,000.00, that it would allow the United States a set off of only 1% of gross receipts, and that it would demand a 10-year operating contract to transfer ownership of the facility.

Following unsuccessful appeals to the contracting officer and the Armed Services Board of Contract Appeals, Lakeshore continued to refuse to convey the Harrisville Facility to the United States. The United States then filed suit in this Court requesting a declaratory judgment that it is entitled to title of the Harrisville facility.

In an opinion dated December 1982, this Court adopted a magistrate's recommendation that summary judgment be granted in favor of Lakeshore. The basis for this ruling was a finding that the purchase price formula was so poorly drafted that the Court could not reasonably determine what percentage of the revenues that the United States paid American Fuel and Lakeshore were intended to be a credit against the purchase price. Specifically, the Court found that the phrase "reasonably allocable to amortization of facility costs" was ambiguous to the extent that it rendered the entire purchase option null and void. The Court also found that the contract was unenforceable because while the option gave the government the right to purchase both the storage facilities and the land on which they are located, the contract failed to specify how the land was to be valued. While the purchase price formula covered the facility, it did not cov-

er the land. The summary judgment which the Court granted Lakeshore was granted on these two very narrow issues. Other issues in this case were not sufficient to support a motion for summary judgment for the reason that genuine issues of material fact remained to be decided. The Court found, for example, that the contract did adequately define the basis for valuing the Harrisville facility from which the credits were to be deducted. Nevertheless, because it was unclear what portion of the revenues paid by the United States were to be credited against that purchase price, summary judgment was appropriate.

**Applicable Law**

The availability of attorney fees under the Equal Access to Justice Act is provided for in 28 U.S.C. § 2412(d)(1)(A) which states:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

Thus, Lakeshore may be awarded attorney fees under the Equal Access to Justice Act only if three preconditions are satisfied. First, Lakeshore must demonstrate that it is an eligible party within the meaning of the Act. Second, the position of the United States must not have been substantially justified. Finally, no special circumstances must exist that would make an award of attorney fees inappropriate in this case. Having evaluated Lakeshore's petition for attorney fees under these criteria, the Court has concluded that Lakeshore's petition for attorney fees should be denied.

**A. Lakeshore is an Ineligible Party**

In enacting and amending the Equal Access to Justice Act, Congress sought to aid a very specific group of individuals and businesses. Specifically, Congress wished to ease the financial burden placed on small businesses by litigating with the United States. Congress did not intend to subsidize litigations costs for large well financed corporations.

In enacting the Equal Access to Justice Act, Congress wished to ease the burden upon small businesses of engaging in litigation with the federal government. Subsection (d) sets forth a generous standard for awarding fees to prevailing parties. Subsection (d)(2)(B), however, limits sharply those eligible as "prevailing parties." Evident from early in the history of the legislation through its passage is a congressional intention to limit the scope of subsection (d) to individuals or to small entities that find particularly burdensome the ever-rising costs of litigation. *See Award of Attorneys' Fees Against the Federal Government: Hearings on S.265 Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Committee,* 96th Cong., 2d Sess. 56 (1980) (testimony of Rep. McDade) (describing plight of "the small business owner" and his "hometown attorney" or "family lawyer") [hereinafter cited as *"Hearings"*]; H.R. Rep. No. 1418, 96th Cong., 2d Sess. 10 (1980), U.S.Code Cong. & Admin.News 1980, 4953, 4988 ("The [bill] focuses primarily on those individuals for whom costs may be a deterrent to vindicating their rights."). The converse of this concern is a desire not to subsidize through subsection (d) the purchase of legal services by large entities easily able to afford legal services. To implement this latter congressional intent in the case at hand, invocation of the real-party-in-interest doctrine is proper. *Unification Church v. I.N.S.,* 762 F.2d 1077, 1082 (2d Cir.1985) (footnote omitted).

Congress has specified which individuals and businesses are eligible to receive attorney fees under Subsection 2412(d). The

term party is defined in 28 U.S.C. § 2412(d)(2)(B) as follows:

'[P]arty' means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed....

In the instant case, the United States argues that the real party in interest is not Lakeshore Terminal and Pipeline Company but, rather, the Detroit & Mackinac Railway Company. Lakeshore responds by arguing that it is the real party in interest and that this fact is attested to by various actions of the United States. Initially, Lakeshore points to the fact that the government brought suit against it and not against the Detroit & Mackinac Railway Company. Lakeshore also points out that it holds title to the Harrisville storage facilities, that it is the party that has contracted with the United States and that the United States has consistently dealt only with it.

In response, the United States points out that Lakeshore is a wholly owned subsidiary of the Detroit & Mackinac Railway Company. More importantly, the government argues that many facts suggest that Lakeshore and the Detroit & Mackinac Railway Company are not autonomous and independent companies. The government notes, for example, that the Detroit & Mackinac Railway Company performs various administrative, accounting, insurance and auditing functions at Lakeshore. Additionally, both companies have the same president and occupy the same offices. In fact, it is the Railway Company that owns the pipeline which runs between the Harrisville facility and Wurtsmith Air Force Base.

While the Court finds the above arguments of the United States persuasive, it finds the interest and involvement of the Detroit & Mackinac Railway Company in this case even more persuasive. The interest of the Railway Company in this case can only be described as one of active involvement. It was, after all, the General Counsel of the Detroit & Mackinac Railway Company, Michael Biber, that initially responded to the government's notice that it intended to exercise its option to purchase the Harrisville facility. Mr. Biber's letter of August 10, 1977 to the Defense Petroleum Supply Agency was sent on letterhead of the Detroit & Mackinac Railway Company and was signed by Mr. Biber as General Counsel for the Railway Company.

Similarly, in responding to a request to explain the reason why Lakeshore purchased the Harrisville facility, Lakeshore responded:

*Answer:* The Detroit and Mackinac Railroad has always maintained an interest in acquiring property in the Harrisville and Tawas, Michigan, areas. With respect to the Harrisville facility, the company had an interest in consolidating the ownership of the Defense Fuel Supply Point ("DFSP") facility and the pipeline running from the facility to the military base, which was already owned by the Detroit and Mackinac Railroad. In addition, taking over the DFSP, the severe economic problems faced by the prior owner was alleviated, providing greater assurance of continuous operation and use of the pipeline. The consequent problem involving the already-owned pipeline was avoided.

■ Considering the totality of these facts, the Court agrees with the United States that the real party in interest in this case is not Lakeshore but the Detroit & Mackinac Railway Company. The Court has reached this conclusion only after careful deliberation and will note that it does not believe that the fact that Lakeshore is a wholly owned subsidiary of the Railway Company is, in itself, dispositive of this issue. Accepting that the Detroit & Mackinac Railway Company is the real party in interest, it is undisputed that the company has a net worth in excess of $7,000,000 and that it employs more than 500 people.

Thus, the Court finds that Lakeshore, as representing the Detroit & Mackinac Railway Company, the real party in interest, is ineligible to receive an award of attorney fees under 28 U.S.C. § 2412(d).

## B. The Position of the United States was Substantially Justified

■ As noted earlier, the Equal Access to Justice Act permits attorney fees to be assessed against the United States only when the government's position was not substantially justified. Even accepting *arguendo* that Lakeshore is an eligible party under the Act, the Court believes that the defendant's petition for attorney fees must be denied because both the underlying actions of the government which gave rise to this lawsuit and the government's litigation position were substantially justified. 28 U.S.C. § 2412(d)(1)(A).

In reaching this conclusion, the Court is first required to fashion a working definition of the phrase "substantially justified." Unfortunately, in enacting and amending the Equal Access to Justice Act, Congress failed to provide such a definition. Nevertheless, most courts that have considered this issue have concluded that the test for determining whether or not the position of the United States was substantially justified is a reasonableness plus standard. Succinctly, the government bears the burden of proving that a reasonable basis existed both in law and in fact for its position. *Russell v. National Mediation Bd.*, 775 F.2d 1284, 1289 (5th Cir.1985); *Trident Marine Construction v. District Engineer, U.S. Army*, 587 F.Supp. 799, 805 (W.D. Mich.1984); *aff'd* 766 F.2d 974 (6th Cir. 1985); *Howard v. Heckler*, 581 F.Supp. 1231, 1233 (S.D.Ohio 1984).

Contrary to the position seemingly adopted by Lakeshore, this definition precludes a court from simply awarding attorney fees in accordance with the disposition of the merits of the case. Moreover, the Court finds that Congress clearly contemplated situations arising in which an opposing party would not be awarded attorney fees despite the fact that the United States lost on the merits of the underlying action. As Senator Thurmond, Chairman of the Senate Judiciary Committee, stated:

> Mr. President, since this is a consensus package, the bill does contain new language on several points. One critical point, which was emphasized by Senator Grassley, is that the award of attorney fees requires an inquiry separate and distinct from the final disposition of the merits in any case. Accordingly, the issues of "substantial justification" relative to the fee award is a separate and distinct inquiry from whatever standard of review has been applied to the merits of the case. Therefore, there could be cases where an agency loses on the merits because a court has found its actions to be arbitrary and capricious, but where no attorney fees would be awarded because the Government was substantially justified in the position it has taken.

131 Cong.Rec. § 9993 (July 24, 1985) (remarks of Senator Thurmond).

■ In the present case, as in any other case, the fact that summary judgment was awarded to Lakeshore is not sufficient in and of itself to support an award of attorney fees. Rather, whether the United States prevails or loses on the merits of the underlying action is but one factor to be considered in determining whether an award of attorney fees is justified in any given case.

Before turning to the merits of the issue of whether or not the position of the United States was substantially justified, one recent amendment to the Equal Access to Justice Act must be noted. The original Equal Access to Justice Act left undefined the phrase "position of the United States." Accordingly, in determining whether the "position of the United States" was substantially justified, many courts very reasonably interpreted that phrase to refer only to the litigation position of the United States. *See Trident Marine*, 587 F.Supp. at 803–04. In 1985, Congress amended the Act to provide that the " 'position of the United States' means, in addition to the position taken by the United States in the

civil action, the action or failure to act by the agency upon which the civil action is based...." P.L. 99–80 § 2 adding 28 U.S.C. § 2412(d)(2)(D). Thus, the Court must look both to the pre-litigation action of the government and to its position on appeal in disposing of defendant's petition for attorney fees. Moreover, because the disposition of the merits of the underlying action and the disposition of the petition for attorney fees involve separate inquiries, the Court must again review the facts of this case. This time, however, the Court must do so with an eye to how they impact on defendant's request for attorney fees.

Applying these criteria to the present case, the Court finds that both the government's litigation position and the actions of the agency were reasonably justified. Initially, it is beyond all question that in contracting with American Fuel Company, the government expressly retained the option to purchase the Harrisville facility. Moreover, the Court believes that the government reasonably believed that it was entitled to have the Harrisville facility transferred to it free of charge.

The actual incurred costs of completing the Harrisville facility was $1,598,100.00. Of the $1,929,400.00 which the United States paid to American Fuel during the first five years of the life of the contract in question, $1,598,100.00 was paid to the construction company and the financing institution. Thus, the government could reasonably assume that $1,598,100.00 of the revenue paid to American Fuel were allocable to the amortization of facility costs. This assumption is at least as reasonable as Lakeshore's assumption that only 1% of the total revenues paid by the United States were allocable to amortization of facility costs, if not more so.

The reasonableness of the position of the United States is further demonstrated by the fact that Lakeshore paid only $95,000 for the Harrisville facility and by the fact that a mutually-agreed upon appraiser valued the Harrisville facility at between $702,485.00 and $1,756,000.00. Clearly, the government reasonably believed that the $95,000 which Lakeshore paid to purchase the Harrisville facility was as low as it was because both Lakeshore and American Fuel recognized that the government retained the option to purchase the facility and that, in the event it exercised that option, it would be entitled to a substantial credit for frontloaded payments. Perhaps the most unreasonable aspect of this case was Lakeshore's valuation of the Harrisville facility and its demand for a 10–year operating contract. That the ambiguity of the purchase price formula rendered the entire option null and void does not make the position of the United States any less reasonable.

Turning more directly to the position of the United States during the trial of this matter, the Court again finds the government's position reasonably justified. In short, the Court finds that the legal argument of the United States to have been adequately supported by existing law. Moreover, the Court will note that both the Magistrate and this Court agreed with substantial portions of the government's position. That two crucial findings required that summary judgment be granted in Lakeshore's favor does not change this fact.

While the Court is also inclined to believe that the special circumstances noted by the United States militate against granting Lakeshore's petition for attorney fees, it is unnecessar  to address these arguments in light of the Court's earlier findings.

Accordingly, Lakeshore's petition for attorney fees is hereby DENIED IN ITS ENTIRETY.

IT IS SO ORDERED.